ADAMANT STONE AND ROOFING COMPANY v. EDWARD VAUGHN, by next friend, etc.

Middle Section.  December 28, 1927.

Petition for Certiorari denied by Supreme Court, March 31, 1928.

J. E. Travis, of Nashville, for plaintiff in error.

William Hume, C. H. Rutherford and William M. Greene, of Nashville, for defendant in error.

FAW, P. J. Edward Vaughn, a minor suing by next friend, brought this suit in the Third Circuit Court of Davidson county against the Adamant Stone and Roofing Company, a Tennessee corporation engaged in the construction of brick and tile buildings in the City of Nashville.

In his declaration the plaintiff avers that he suffered serious and permanent personal injuries as the result of alleged carelessness, recklessness and negligence of the agents and servants of the defendant, and he sues for $10,000 as damages.

The case was tried to a jury upon the issues made by defendant's plea of not guilty to plaintiff's declaration. At the close of plaintiff's proof and again at the close of all the evidence the defendant moved for a directed verdict in its favor, but the motions were overruled.

The jury found the issues for the plaintiff and fixed his damages at $7,500. The motion for a new trial on behalf of the defendant was overruled, and judgment was entered for the amount of the verdict, with costs. Thereupon the defendant prayed an appeal in the nature of a writ of error, which was granted by the court and seasonably perfected by the defendant.

For convenience, the parties will be designated as plaintiff and defendant, respectively, according to their status on the record in the circuit court.

The defendant has presented seven assignments of error to this court. Four of these assignments of error must be eliminated from consideration here, for reasons which will now be stated.

The second assignment is that "the evidence preponderates in favor of the defendant." This assignment does not present a question that can be considered by this court, for the reason that, under well-settled rules, the appellate court will not disturb the verdict of a jury on the facts if it is supported by any material evidence. Railroad v. Abernathey, 106 Tenn., 722, 728, 64 S. W., 3, and other cases there cited.

The third assignment is that "the verdict is contrary to the law and evidence and could only be arrived at by basing an inference upon an inference." An assignment that "the verdict is contrary to the law and evidence" is not good as an assignment of error in this court, as it is not equivalent to an assignment that there is no evidence to support the verdict. Record v. Cooperage Co., 108 Tenn., 657, 69 S. W., 334.

The assertion contained in the third assignment that the verdict "could only be arrived at by basing an inference upon an inference" is, if sustained by the record, available to defendant in support of other assignments which we will presently discuss.

In its fourth assignment the defendant says the trial court erred in overruling its motion for a directed verdict made at the close of the plaintiff's proof, and also that the court erred in overruling defendant's motion for a directed verdict made at the close of all the evidence. The defendant did not elect to stand upon its motion for a directed verdict made at the close of the plaintiff's proof, but proceeded, after that motion was overruled, to introduce evidence in its own behalf, and thereby waived its first motion for a directed verdict. Coal & Iron Co. v. Bennett, 8 Hig., 210; John Gerber Co. v. Smith, 150 Tenn., 255, 263 S. W., 974. But the defendant may

rely upon its fourth assignment of error, insofar as that assignment challenges the action of the trial court in overruling defendant's motion for a directed verdict made at the close of all the evidence. In this latter aspect the fourth assignment of error will be hereinafter considered.

Through its fifth assignment the defendant complains of the action of the trial court in declining to charge its special requests numbered one, two and three, and this assignment purports to contain copies of three special requests for instructions, numbered as above indicated; but no such requests appear in the record, except in the defendant's motion for a new trial. This is not sufficient to show that such requests were tendered to the trial judge and that he refused to give them in charge to the jury. The motion for a new trial is a mere pleading, and its inclusion in the bill of exceptions only shows that the statements and allegations therein were made on the motion, not that they are true. Sherman v. State, 125 Tenn., 19, 49, 140 S. W., 209; Richmond, etc., Foundry v. Carter, 133 Tenn., 489, 493, 182 S. W., 240; T. C. Railroad Co. v. Vanhoy, 143 Tenn., 312, 333, 226 S. W., 225.

The defendant's seventh assignment is that "the court erred in overruling defendant's motion for a new trial and entering judgment in favor of the plaintiff and against the defendant in the sum of $7,500." This assignment is too general and indefinite to constitute a valid assignment of error. The rules of this court and of the Supreme Court require that assignments of error shall show specifically wherein the action complained of is erroneous, and how it prejudiced the rights of the plaintiff in error.

For the reasons stated, the second, third, fifth and seventh assignments of error, and that part of the fourth assignment which challenges the ruling of the trial court on the motion for a directed verdict made at the close of plaintiff's evidence, are overruled.

This leaves for consideration (1) the first assignment, which is, that "there is no evidence to support the verdict, (2) that part of the fourth assignment through which it is asserted that the court erred in overruling defendant's motion for a directed verdict at the close of all the evidence, and (3) the sixth assignment, which is that "the judgment is excessive and so excessive as to show passion and caprice on the part of the jury."

The first and fourth assignments, supra, call for a consideration of the evidence in the record from substantially the same viewpoint, for "if there was sufficient evidence in support of the cause of action stated in the declaration to require a submission of the case to the jury, there is necessarily some evidence to support the verdict of the jury." Citty v. Miller, 1 Tenn. App. Rep., 1, 3, and cases there cited.

The facts upon which plaintiff sought to predicate his action are alleged in his declaration as follows:

"On or about January 15, 1925, the plaintiff was engaged in working for Foster Creighton Company as a carpenter's helper, in connection with the construction of a building on the southwest corner of Seventh avenue North and Cedar street, Nashville, Tennessee, known as the Memorial Apartment. · At the time aforesaid, plaintiff was standing at or near a rip saw which was positioned on the ground immediately in front of and adjacent to that portion of said building facing Seventh avenue. Among the several contractors performing different parts of work on said building, was the defendant Adamant Stone & Roofing Company, which had charge and control of all of the brick masonry work, including the setting of hollow tile blocks that were being used in the construction of the walls of said building. At the particular time of the injuries herein complained of, the defendant, its agents and servants, were working on one of the floors near the top of the building, it being about eight stories high. The side walls of the building were being constructed, but the wall at the front or Seventh avenue side of the building had not been constructed, so as to close in the upper floors. The defendant, its agents and servants, were working at or near the front of said building setting the hollow tile blocks in the south wall at or near the southeast corner of said upper floor, high above, and almost immediately above, the place where plaintiff was working near the rip saw on the ground below.

"While plaintiff was at work in the place aforesaid, and in the exercise of due care, the defendant, its agents and servants, working at or near the southeast corner of said upper floor, high above the plaintiff, carelessly and negligently failed to securely and properly set one of said large hollow tile blocks in the wall being constructed by defendant, on account whereof said large hollow tile block was carelessly and negligently permitted to fall from said wall, high above the place where plaintiff was working on the ground below, and in its downward course striking against the cornice of the roof of the adjoining building, breaking into sharp and jagged pieces, one of which fell with terrific force striking plaintiff on the head, face and hand, and striking him to the ground, badly cutting and mangled and maimed him for life."

The declaration also contains a detailed description of plaintiff's injuries, and an averment that all of said injuries "were due proximately to carelessness, recklessness and negligence of the defendant, its agents and servants."

It appears from undisputed evidence that, on January 15, 1925, a falling tile struck plaintiff and inflicted serious injuries upon his person; but it is insisted for defendant that there is no evidence up-

on which the jury could base a finding that the tile which struck plaintiff was permitted by the negligence of defendant's agents and servants to fall from the wall of the upper floor of the building mentioned in the declaration. In fact, it is insisted that there is no evidence that any act or omission of the defendant's agents and servants caused or permitted the tile to fall; that the source from which the tile started on its downward course is not disclosed by any legitimate evidence in the record, and is a matter of conjecture and surmise.

At the time he was injured as above stated, plaintiff was sixteen years of age, and was employed by the Foster Creighton Company as a "carpenter's helper," and was operating a rip saw in front of the Memorial Apartment then in course of construction by the Foster Creighton Company as "general contractor." The Memorial Apartment is an eight-story apartment house located at the southwest corner of Seventh avenue North and Cedar street in the City of Nashville, and fronts on Seventh avenue North. It extends westward along the south side of Cedar street for a distance of about 150 feet. The front or east wall of the building is thirteen feet west of the sidewalk on Seventh avenue North, thus leaving between the front of the building and the sidewalk an open space, or yard, and, at the time plaintiff was injured, this yard and the sidewalk immediately east or in front of it were enclosed by a fence extending from the southeast corner of the building eastward to the outer or eastern margin of the sidewalk on Seventh avenue North, then northward along the east margin of the sidewalk to Cedar street, and then westward with the north margin of the sidewalk on Cedar street to a point opposite the northwest corner of the building.

The "saw rig" which plaintiff was operating, and beside which he was standing when injured, was situated in front of the building, within the fenced enclosure above mentioned, about eight or ten feet from the front wall and approximately the same distance from the fence on the south side of the enclosure; that is to say, plaintiff was about eight feet north of the line of the south wall of the building extended.

The defendant, in the performance of a contract to do the brick and tile work on the Memorial Apartment, had erected the north and south walls up to a point about five or six feet above the floor of the eighth story of the building, and some workmen in the employ of defendant were at work on these walls when plaintiff was struck by the falling tile. The front or east wall had not been built above the first, or possibly the second, story, and above this the front of the building was open. The outer part of each wall was built of brick and the inner courses of hollow tile—the dimensions of each tile block being 8x12x12 inches and the weight thirty or thirty-two pounds.

Harry Dyer and H. L. Legg, employees of defendant, were setting tile in the south wall. They were both experienced and competent tile setters. Dyer was working at the east end of the south wall, and was engaged in "toothing up" the southeast corner. The proof places Legg somewhere from fifteen to thirty feet west of Dyer.

The issue is so framed, under the pleadings and proof, that plaintiff must recover, if at all, upon the theory that the negligence of Harry Dyer was the efficient cause of plaintiff's injuries.

The record contains the testimony of only one witness who claimed that he saw the tile fall on plaintiff, and he did not claim to know the place from whence the tile started on its fall. Aside from the testimony of this one eyewitness—Orville Martin—and the evidence with respect to the nature and extent of plaintiff's injuries, the plaintiff's case depends upon circumstantial evidence.

Orville Martin is a carpenter and ornamental iron worker, but he had no connection with the work on the Memorial Apartment. Martin had stopped in front of the building and was looking over the fence toward the building from a point which placed the plaintiff directly between Martin and the building, and while in that situation Martin saw an object falling and saw it strike the boy at the saw rig and knock him down. Martin went inside the enclosure and saw that the object which fell and struck plaintiff was a piece of tile. Martin also testified that when he first saw the descending object it was up in the air, twenty or thirty or forty feet above the ground; that when he saw it fall on plaintiff he (Martin) immediately looked up toward the top of the building "to see whether anything else was coming," and saw a "small, medium-sized man," wearing a red sweater and a cap, leaning out and looking down from the top floor at the southeast corner of the building, and apparently holding to a steel column, and that he saw no other person looking out of the front of the building at that time.

It appears from the testimony of other witnesses that Harry Dyer customarily wore a red sweater and a cap while at work, and there is no evidence that he was clothed otherwise on the occasion in question.

The plaintiff's theory is that the tile block which struck him fell from the end of a layer of tiling at the southeast corner of the building, in the eighth story, where it had been recently placed by Harry Dyer as a "tooth" in the process of "toothing up" the east end of the south wall. The process of "toothing" employed by brick layers and tile setters is explained in the record, but we do not think it important to develop that subject here, further than to say that the south wall of the Memorial Apartment, although built up to a height of five or six feet above the floor of the eighth story, lacked three or four feet of reaching the front line of the building, and in this

incomplete end of the wall the halves of the end tile blocks of alternate layers projected beyond the end blocks of the adjacent layers. In such case, the projecting part of a block is, in title setters' parlance, called "tooth," and the process of building up the end of a wall in the manner just described is called "toothing."

According to the undisputed testimony of witnesses for both plaintiff and defendant, it is contrary to the custom of brick layers and tile setters, and is bad workmanship, to place the end block on a top layer where it forms a "tooth," until the construction of the wall has further progressed to a point where such tooth will have support, for if the top layer of tile is "toothed up," a very slight overbalancing of the "tooth" will cause it to fall from its position.

The plaintiff's theory in this case is that Harry Dyer "toothed out" the top layer at the east end of the south wall, and the "tooth" —a tile block weighing thirty or thirty-two pounds—was left without adequate support, and fell on plaintiff. This was denied by Dyer, whose deposition was read on behalf of defendant. However, it is not our function, in a case of this kind, to find where the preponderance of the evidence lies, but our duty is merely to ascertain whether there was any material evidence to take the case to the jury. The credibility of the witnesses and the weight of the evidence were matters for the jury to determine; hence it is our duty to resolve all conflicts of evidence in favor of the party who was successful below. It is legally possible, and is a matter of frequent occurrence, for circumstantial evidence to outweigh the testimony of a witness testifying positively to an asserted fact as transpiring within his view. Jones on Evidence, 2nd Ed., Vol. 1, sec. 12, p. 25.

Viewing the evidence in the record in that aspect most favorable to the plaintiff of which it is reasonably susceptible, we find that there is testimony of witnesses who examined the premises in question a few minutes after the tile fell on plaintiff, and again on the following morning, from which it appears that a bed of fresh mortar (not yet dry but soft and wet) had been spread on the tile block upon which half of the "tooth" rested (if it was placed as claimed by plaintiff), and the appearance of this mortar indicated that a tile block had been laid on it; that there was fresh mortar on half of the bottom of the tile block which fell on plaintiff; that the upper tile block remaining in place after plaintiff's injury had an appearance as if "something had fallen on the edge and chipped it off;" that there was a "fresh scar"—a "chipped off place"—in the edge of the cement floor about five feet below the position which the end tile on the top layer would occupy, if placed, and some "frazzled pieces" of tile at that point; that there were evidences on a scaffold about two stories below and at the southeast corner of the building that the scaffold had been struck by a falling object; that

there was a "dent" or "crushed place" in the tin cornice on the north wall of an old two-story building which stood four feet south of the Memorial Apartment building; that the relative positions of the several objects mentioned above as bearing evidence of contact with a falling object were such that it was reasonably possible for a tile block falling from the end of the top layer of tiling at the southeast corner of the Memorial Apartment building to have come in contact with each of these objects in succession and then strike plaintiff at the saw rig; that Harry Dyer was the only tile setter at work near the southeast corner of the building, and that there were no tile setters at work on any floor below the eighth.

The proof shows that there were tile blocks on other floors of the Memorial Apartment, but there is also proof that such blocks were not close enough to the front to afford a reasonable probability that any one of them fell or was thrown from the building, and there is no evidence in the record which tends to show where the tile which fell on plaintiff started from, other than that which plaintiff relies upon as showing that it fell from the east end of the south wall where Harry Dyer was at work on the eighth floor of the building.

It is insisted for defendant that the verdict cannot be sustained except by basing "an inference upon an inference or a presumption upon a presumption," and that this is not permissible. The rule which defendant thus seeks to invoke is sound and well settled, and has been frequently applied in Tennessee cases; among others, Railroad v. Lindamood, 111 Tenn., 457, 472, 78 S. W., 99; DeGlopper v. Railway & Light Co., 123 Tenn., 633, 645, 134 S. W., 609; L. & N. Railroad Co. v. Jackson, 3 Tenn. App. Rep., 463, 471.

But the jury may find a fact from circumstantial evidence and the fact thus found may be used as the basis of a presumption in passing on other evidence, without contravening the rule that an inference cannot be based upon an inference.

In sections 363-364 of the second (1926) edition of Jones on Evidence there is an illuminating discussion of the so-called "rule" here in question, and the view of the author, supported by numerous adjudged cases cited in the footnotes, is that "once the facts are established from which a presumption or inference logically flows or legally arises, whether such basic facts are established by circumstantial evidence or by direct testimony, it is the province of the jury to deduce the presumption or inference."

The concluding paragraph of section 364 of Jones on Evidence, supra, is in these words:

"The rule is perfectly plain when its terms are understood as intended. But counsel repeatedly strive to make use of the rule in a manner in which it was never intended by extending the use of the terms 'presumption' and 'inference' beyond the recognized

scope of their meaning in the sense of the rule, which is that of pure deductions raised only in passing and for want of more positive evidence, to include deductions which have passed far beyond that stage and have become 'facts' established by circumstantial evidence. Admittedly, the repeated misuse of the terms, and the unfortunate lack of terms more appropriate, supplies an abundance of opportunity in this regard. We can only be thankful that the perspicacity of our courts has awakened to the extent that, after paving the way to error by careless use of terms, they do not hesitate to retrench and are rarely led astray by the contention of zealous counsel in seeking to gain a point by reliance upon a rule that is little more than a terse statement of principle coupled with interpretation of that rule in the light of misuse of its component terms.''

In the case at bar, there was circumstantial evidence from which the jury could have reached the conclusion that the tile block which injured plaintiff fell from the eighth story of the Memorial Apartment building, after being placed by Harry Dyer on the east end of the south wall as a ''tooth,'' all in accordance with the contention of plaintiff as hereinbefore stated. This was a finding of fact, and from this fact, taken in connection with the testimony of experienced tile setters that a tile block thus placed is not secure and is likely to fall, the jury could legitimately draw an inference that Harry Dyer placed the block in a negligent manner. This was an inference drawn from a fact, and not an inference based on an inference, within the contemplation of the rule under discussion.

The Lindamood, DeGlopper and Jackson cases, supra, are not in conflict with the view just stated. In each of those cases the court found (as said by Judge Lansden in the DeGlopper case) that ''the act which caused the injury and the negligence of the defendant in relation to the act must be inferred from the accident itself,'' and it was, therefore, apparent that the jury had reached its verdict by basing an inference upon an inference.

Being of the opinion that there is evidence in the record which, if accepted by the jury as the truth of the case, affords a sufficient basis for a verdict in favor of plaintiff, the defendant's first and fourth assignments of error are overruled.

This leaves for further consideration only the seventh assignment of error, which is that ''the judgment is excessive and so excessive as to show passion and caprice on the part of the jury.''

Plaintiff is entitled to the most favorable consideration of the evidence tending to support the amount of the verdict of which it is reasonably susceptible. There is practically no conflict in the testimony relating to the nature and extent of plaintiff's injuries and his sufferings as the result thereof. It was, therefore, the func-

tion of the jury to draw all legitimate inferences from the evidence and assess the amount of damages to which, in the judgment of the jury, plaintiff was entitled.

Plaintiff had a fracture two or three inches long at the base of his skull. The left side of his face was cut through the flesh from the eye to the tip of the nostril. The lower end of the left side of his nose was torn loose. His upper left jawbone was fractured. One tooth was knocked out. The crowns were broken off of two other teeth, and several teeth were loosened. Two fingers on his left hand were broken and crushed, and had to be amputated. He also lost the tip of another finger on his left hand.

Within a few minutes after the accident plaintiff was carried, in an ambulance, to a hospital in Nashville, where he was promptly given attention by Dr. Sayers, an eminent physician and surgeon, but plaintiff's condition was considered too critical at that time to attempt to even sew up the wounds on his face. With respect to plaintiff's condition at the time he reached the hospital, Dr. Sayers testified as follows:

"On account of the extreme bad condition he was in I did not consider it advisable to do anything to him at that time, that is, to give him an anaesthetic to even repair the wounds. He was merely sent to his room, his spine was punctured, or tapped, in order to relieve the pressure from the accumulation of blood; ice bags were placed to his head, wounds were cleansed and temporary dressings, but no sutures at that time, and then, general observation of his condition."

On the fourth day after his injury, plaintiff was carried to the operating room of the hospital where splintered particles of jaw-bone were removed and the left side of his face, which had been "torn entirely off," was sutured back in position. Plaintiff was delirious for about a week after he was injured, and intermittently so for a few days thereafter.

Plaintiff remained at the hospital for one month, then spent a month at the home of his aunt, Mrs. Peach, after which he returned to his mother's home. He was under the care of Dr. Sayers for about three months.

The testimony of witnesses who observed plaintiff while he was at the hospital reveals manifestations of agonizing and excruciating pain and suffering on his part. When the nature of plaintiff's injuries is considered, testimony that he suffered intense pain, both physical and mental, is easily credited.

Plaintiff has a large permanent scar on his face extending from his eye to his upper lip. He testified on the trial that he still suffers pain with the "cut" in his face—that it "draws, gets tight, and then cracks open;" that he is left-handed, and that, by reason of the

loss of his fingers, his left hand is incapable of the same use as before the injury; that his teeth give him a little trouble "off and on;" and that he sometimes has "hot rushes of blood through his head."

There is undisputed testimony of several witnesses, relatives of plaintiff, who have seen much of him in their respective homes, to the effect that plaintiff's mental attitude is very much changed since he was injured; that before the accident "he always seemed to be lively and always had plenty to say, laughing and talking and joking all the time," but now sits or "creeps" about the house in silence, with very little to say, and is not at all "sociable" in his disposition; that before he was injured plaintiff was bright and alert, but since the accident he is mentally sluggish and forgetful. Dr. Sayers testified that it was entirely possible for the injuries suffered by plaintiff to cause him to be sluggish, and to have a different mental attitude from that which he had before he was injured. Plaintiff testified that he has not been able to do "heavy work" since he was hurt. At the time of the trial below, plaintiff was employed at the Methodist Publishing House, in the City of Nashville, carrying books from a bindery at $10 per week—the same wages he was receiving from the Foster Creighton Company at the time he was injured. However, it does not follow from this latter fact that plaintiff's earning capacity has not been impaired. Central Mfg. Co. v. Cotton, 108 Tenn., 63, 66, 65 S. W., 403.

After a careful scrutiny and consideration of the evidence touching plaintiff's injuries and sufferings, which evidence we have stated only in its bare outlines, we are of the opinion that there is no basis in the record for a holding that the verdict is so excessive as to show passion or caprice on the part of the jury. In actions for personal injuries the amount of damages which should be allowed is primarily a question for the jury, and when the amount assessed by the jury is approved by the trial judge, this court should not attempt to substitute its judgment for that of the jury, so long as the amount is not so great as to "shock the judicial conscience." 8 R. C. L., pp. 658-659.

It results that all of defendant's assignments of error are overruled, and the judgment of the circuit court will be affirmed. Judgment will be entered here in favor of the plaintiff Edward Vaughn, by next friend, etc., and against the defendant Adamant Stone and Roofing Company, for $7500, with interest thereon from the date of the judgment of the circuit court, and for the costs accrued in the circuit court. The costs of the appeal will be adjudged against the defendant Adamant Stone and Roofing Company and the sureties on its appeal bond.

Crownover and DeWitt, JJ., concur.