# TENNESSEE VALLEY ELECTRIC COOPERATIVE v. C. D. HARMON.—286 S. W. (2d) 593.

Western Section. August 29, 1955.

Petition for Certiorari denied by Supreme Court, February 3, 1956.

Ross & Ross, of Savannah, for plaintiff in error.

W. W. Lackey and P. M. Harbert, both of Savannah, for defendant in error.

BEJACH, J. This case involves an appeal from the judgment of the Circuit Court of Hardin County, Tennessee, against the plaintiff in error, Tennessee Valley Electric Cooperative, for the sum of $575 as damages for the death of some cattle claimed to have been killed by eating vegetation that had been sprayed with an alleged poisonous chemical used by the Cooperative for the control of vegetation along the right-of-way on a line of its right-of-way in the maintenance of its electric distribution system. The parties will be styled as in the lower court, plaintiff and defendant.

The case was tried before a jury at the July term, 1954 in the Circuit Court of Hardin County. The jury returned a verdict in favor of plaintiff for the sum of $575. The defendent filed a motion for a new trial within the time allowed by the Court. The motion for new trial was overruled by the trial judge, and to his action, the defendant excepted and prayed an appeal to the Court of Appeals. A bill of exceptions was filed and the appeal to this Court was perfected.

Plaintiff, C. D. Harmon, brought this suit against the defendant for the sum of $1,000, alleging that the defendant did, on the 3rd day of September, 1953, go upon the lands which the plaintiff was renting and using as a pasture, and sprayed or distributed "certain deadly chemicals in the air and on vegetation growing under and for some distance on each side of said power lines" of the defendant. The declaration further alleges that these "deadly chemicals" were sprayed without the knowledge, consent or permission of the owner of the land or of the plaintiff—that the deadly chemicals were

sprayed on vegetation by the defendant when it knew, or by the exercise of reasonable care, should have known, that defendant pastured his cattle on the land, and that the cattle would likely eat the vegetation, and that the defendant sprayed said "poisonous chemicals" on or about said vegetation; and that the defendant should have known, by exercise of reasonable care, that the chemicals were poisonous to cattle. The declaration alleged that as a result of negligent acts of the defendant in spraying said "poisonous chemicals" on said vegetation, plaintiff's cattle became sick, and three cows of plaintiff died; and that plaintiff was required to spend large sums for a veterinarian and other expenses in an effort to save the cattle from death as a result of said poison; and that said three cows died from said poison, in spite of efforts of plaintiff.

To the plaintiy's declaration, defendant filed its plea of general issue.

The Tennessee Valley Electric Cooperative is a corporation organized under the laws of Tennessee to distribute electric energy in Hardin and Wayne Counties, and as such, has an electric distribution system in said counties, and has electric wires on poles in rural areas of the county which cross many pastures, run along the highways, and in other locations. In the operation of the electric system, it is necessary for the Cooperative to maintain its right-of-way for these lines, and to keep trees and brush from growing into the lines so as to interfere with the lines and interrupt the electric current being supplied to customers along these lines. In maintaining its right-of-way, the defendant used a chemical brush control, referred to as a "herbicidal", under the trade name of "Weedicide", composed of 2,4,5-T and 2,4-D esters.

On the 3rd day of September, 1953, defendant sprayed in the vicinity of the pasture of the plaintiff,—the 3rd of September being Thursday. On Monday following, the plaintiff had some cows become sick, and took one of the cows to Dr. Stroupe, a veterinarian in Corinth, Mississippi, where the cow was examined. Plaintiff carried the cow back to the veterinarian on Tuesday where the cow died. There as a convention of veterinarians in session in Corinth at that time, and the cow was examined by some forty or fifty veterinarians, in connection with a post mortem examination of the said cow. A day or two later, plaintiff had two other cows to die. His two calves became sick, but did not die.

It is the contention of the plaintiff that the cows were poisoned by the spray used by defendant.

Proof established that the concentrate of the spray was mixed in the proportion of one gallon of the concentrate to one hundred gallons of water, and that only five gallons of the mixture was sprayed on the pasture of the plaintiff. The defendant contended that its spray was not poisonous or harmful to cattle, and evidence tending to establish that fact was introduced.

The defendant, as plaintiff in error in this Court, has filed eight assignments of error. The first four assignments of error raise the question of whether there was any evidence to sustain the verdict of the jury, or stated otherwise, as to whether the trial judge should have granted defendant's motion for a directed verdict. Assignment of error 5 complains of the trial judge having sustained the exception of the plaintiff to the testimony of Wesley M. Jackson with reference to a report on the chemicals used in spraying, made by Riverside Chemical Company. The language of this report will be quoted in discussing this assignment. Assignments 6 and 7 com-

plain of the refusal of the trial judge to give special requests asked for by defendant. Assignment 8 complains of the conduct of the trial judge in adding to a special request made by the defendant, and which was given in the charge to the jury, additional language which defendant complains was improper and destroyed the effect of the instruction already given. We will first dispose of assignments of error 5, 6, 7, and 8, after which we will discuss the question of whether defendant's motion for a directed verdict should have been granted.

■ Assignment of error number 5 complains of the action of the trial judge in excluding from the evidence a report as to toxicity of 2,4-D, one of the chemicals used by defendant in spraying its right-of-way. This report was in the words and figures, as follows:

"Riverdale Chemical Company

"324 East 147th Street, Harvey, Illinois
 "Toxicity—2,4-D

"This is part of a report by Samuel W. Matthews in the August 1953 issue of the National Geographic Magazine, Volume CIV, Page 203, on work done by the United States Agriculture Research Center at Beltsville, Maryland.

"When scientists at Beltsville first discovered 2,4-D's Weed killing powers, they tested it thoroughly on nearby golf courses and experimental plots. They were still not sure, however, whether it could be used safely around farm animals or man. For 106 days a cow was fed grain with enough of the plant poison in it to kill a tree. Blood samples were taken and applied to seedlings. The plants showed there was 2,4-D in the blood, but the cow was unharmed and the chemical did not appear in her milk.

"Then Dr. Ezra J. Kraus, a Department of Agri-

culture scientist—since retired—took capsules of pure 2,4-D every day for three weeks. He suffered no ill effects, proving that the new miracle spray could be used safely. In 1945 it was released to the public.

"Some 30,000,000 pounds a year are sold.

"Very truly yours,
Riverdale Chemical Company

"was :m"

This report was offered as part of the testimony of Wesley M. Jackson, manager of the defendant. The report was objected to on the ground that it was not the best evidence of its contents. It is insisted on behalf of defendant, however, that even if the report in question was not admissible as substantive evidence to prove the fact of the non-toxicity of the chemicals used by defendant, nevertheless, it was and should have been properly admitted as tending to show the care and investigation used by the defendant before said chemicals were used. We think this contention of the defendant was well taken, and the evidence should have been admitted by the trial judge.

 The sixth assignment of error complains of the refusal of the trial judge to give a special instruction tendered by the defendant, as follows:

"I charge you that the plaintiff must show by a preponderance of the evidence that the chemical sprayed upon the pasture of C. C. Harmon was poisonous. If the plaintiff has not shown this by a preponderance of the evidence, then you should find for the defendant and your verdict should be not guilty."

The only part of the general charge of the Court which could be said to have covered the same ground as the special request asked, was as follows:

"Mr. Harmon must prove his case substantially as stated in the declaration, by a preponderance of all the evidence in the case before a recovery can be had. If the evidence is in equipoise or evenly balanced, you should find for the defendant."

The allegation that defendant sprayed poisonous chemicals was one of the material allegations of plaintiff's declaration, and of course, under the general charge, had to be proved, like any other material allegation of the same declaration, by a preponderance of the evidence. While we think it would have been proper for the trial judge to have given the special request tendered, we do not think that his failure to do so should be considered reversible error—the general charge covering it to some extent, at least. Assignment of error number 6 is accordingly, overruled.

Assignment of error number 7 complains of the failure of the trial judge to give another special request tendered by defendant, as follows:

"The defendant has the right to rely upon the label of the contents of the container thereof, when it is shown that the container has been purchased from a reliable manufacturer."

In the examination of defendant's witness, Jonakin, attorneys for the plaintiff objected to his testimony about the label, and that it was not evidence, or the best evidence, of the contents of the container. The Court sustained this objection. The label, itself, is in the record, and Mr. Jonakin was asked about the label. He was asked on cross-examination if he knew that the contents of the barrel conformed to the label, and he answered, of course, that he did not.

All containers containing herbicides are required to be labeled under the laws of the United States when shipped

in interstate commerce. U.S.C.A. Title 7, Sec. 135, etc.

The defendant has a right to rely upon the label as to the contents of the container when he purchased same from a reliable manufacturer in interstate commerce; and it certainly would not be negligence on the part of the defendant to use this chemical when there was no warning of any character on the label that it was injurious to humans or live stock. If it had been a toxic compound or chemical, then under the laws and regulations of the United States Department of Agriculture, this fact would have had to appear upon the label. U. S. C. A. Title 7, Sec. 135.

The trial judge, nowhere in his general charge, called attention of the jury to the fact that the defendant had a right to rely on the statement of the manufacturer as to what the chemical used was. Since the trial judge did not cover this in his general charge, we think this special request should have been granted, and this assignment of error 7 is accordingly, sustained.

■ Assignment of error number 8 complains of the trial judge having added to the defendant's special request number 2, which was given to the jury, an additional charge. Special request number 2, as given, is as follows:

"Gentlemen, I charge you that the defendant has the right to maintain its right-of-way for its lines, by what means deemed best by the defendant, and if it exercises that degree of care that an ordinarily prudent man would have exercised, under the same or similar circumstances, then the defendant would not be guilty of negligence, and the verdict should be for the defendant."

Having given the special request, as above quoted, the trial judge on his own initiative added:

"On that basis only, however, of course, if the de-

fendant goes upon this property and spreads chemicals that when eaten by cattle would cause them to become sick and die, if you find that was the case, then they were not exercising that degree of care an ordinarily prudent person would do, under the circumstances.''

Defendant contends that this added charge given by the judge was telling the jury, in effect, that the spraying of the chemical was negligence per se; that the spraying of this chemical, whether poisonous or not, was not what an ordinarily prudent person would do, regardless of the knowledge of the defendant, or whether it knew or didn't know what effect it would have upon cattle.

We agree with contention of defendant. Either the special request should not have been given at all, in which case there would have been no occasion for the additional charge, or if given, the additional charge should not have been added. We think this was prejudicial to the rights of defendant, and the 8th assignment of error should be sustained.

We take up, now, assignments of error 1, 2, 3, and 4, which raise the question as to whether a directed verdict should have been granted by the trial judge. This requires an examination of the evidence.

We accept, of course, as a sound rule that in reviewing the evidence in this Court, we can consider ''only that evidence, and facts presented, and the inference to be drawn therefrom, that tend to support contentions of the plaintiff.'' In so considering the evidence, this Court must consider only those facts and circumstances, together with reasonable inferences therefrom, which tend to support the fact that there was a causal connection, disregarding all countervailing evidence. We recognize, also, that, ''a fact may be proved by circumstantial evi-

dence, and from the fact thus proved another fact may be inferred, without contravening the rule that an inference cannot be based upon an inference." Nashville Gas & Heating Co. v. Phillips, 17 Tenn. App. 648, 69 S. W. (2d) 914, 923; Adamant Stone & Roofing Co. v. Vaughn, 7 Tenn. App. 170.

The first witness was the plaintiff, himself, who testified that he lived on and worked lands owned by Mr. Ernest Churchwell and Mrs. Josie Baker; that he lives in the house of Mr. Churchwell and worked Mrs. Baker's land. He said his cattle were pastured on the property of Mr. Ernest Churchwell about 300 yards on the right-hand side of the road going toward the river from his home; that there were power lines or poles over the pasture across one corner of it near the road. He said that there was about 100 yards, or in the neighborhood of that, where the power line crossed; that there was grass, weeds, and "stuff" along there, including a few little trees; that the water in his pasture was on the north side, away from these lines; and that there were about 30 acres in the pasture. He had five head of cattle —four cows and three calves, nine in all, on the pasture at the first of September, but later it was only eight head, altogether. There was another pasture on the place, but it had been "eaten out". He said that there were two small calves kept in the barn,—that the rest were in the pasture. He was asked wheather he had six head in there, and he answered that he did. He had been using the pasture ever since he had been there, some six years or so. He said his cattle were healthy. He said "they sprayed the 3rd of September". He was told he would have to be a little more explicit, whereupon he stated, "The R. E. A." And, finally, when asked who maintained the lines, he said, "Tennessee Valley Electric Coopera-

tive, I reckon." This witness did not testify that the defendant had sprayed in his pasture, but he said that shortly after September 3, the vegetation along the power line shriveled up and died, in his pasture, as well as elsewhere; and that on the Monday evening following, he first noticed something wrong with his cattle,—one of the cows was panting. He carried her to Corinth and came back and looked at the others. Two more were panting. He said that the cow carried to Dr. Stroupe was carried back the second time and died on Tuesday night. With reference to the other cattle, he said that they died "right off", one lasted a few days and the next died shortly after that, making three in all that died; and that the symptoms of the cattle were the same as the one that died at Corinth. He said that nothing happened to the fourth cow that he owned, and "The way I figure on that, she wasn't eating with the rest, they fought her and she stayed back from them." He said the symptoms of the two calves that did not die, were the same as those of the cows that did die. He testified as to the value of his cattle that they were worth from $125 to $175. One was worth $125, one $150 and one, $175, and that the value of the calves was about $50, or $25 each.

Jesse Qualls testified that he lived at Pyburn, about a quarter of a mile from where plaintiff lived; that on September 3, he saw the truck on the road spraying. His testimony was of little importance because he admitted that he did not see around the curve of the road where the plaintiff's pasture was.

Dr. Stroupe, a veterinarian of Corinth, Mississippi, testified that plaintiff brought the cow to him the first part of September, 1953, and that he was consulted on Sunday afternoon and night about the cow. He said the

cow was panting fast, didn't have any temperature; that he treated the cow and the plaintiff took the cow back home, but called him on Tuesday morning, following, saying that the cow was worse and that the plaintiff brought the cow back to his clinic in Corinth, Tuesday morning, and that about an hour after she was brought there, she died. He said that there was a veterinary meeting on at Corinth at the time, with about seventy veterinarians there. He asked some of them to assist in posting the cow and explained that this meant cutting the cow open to see what condition the body was found to be inside for the purpose of making a diagnosis. He said that the indications were that the cow died of poisoning. The poison was chemical in character, he said, but he could not, or did not, identify what particular type of poison had caused the death of the cow. He said he did not know anything about the contents of the sprays used on the defendant's right-of-way. He said that most of the sprays used contained toxifane. He did not, however, say that there was any indication of toxifane poisoning in the dead cow; and nowhere did he state that the chemicals used by the defendant were poisonous to cattle. It was definitely established by one of the defendant's witnesses that the spray used by defendant did not contain toxifane. It was also established by defendant's witness, Jonakin, that 2,4-D and 2,4,5-T were not injurious or poisonous to cattle, and it was shown by the testimony of defendant's witness, Carl Ferker, that only 2,4-D and 2,4,5-T were used in the spray of the defendant.

We deem it unnecessary to summarize or analyze the remainder of the testimony because Dr. Stroupe was the only witness for plaintiff who testified that the cows of plaintiff died from poisoning, and his testimony did

not connect the poison in any way with the spray used by the defendant. No witness for the plaintiff testified that the spray used by defendant was poisonous or injurious to cattle, although this was one of the material allegations of the plaintiff's declaration.

The trial judge charged the jury:

"The plea of defendant, Tennessee Valley Electric Cooperative, is not guilty, the legal effect of which is to deny every material allegation in the declaration and to cast the burden of proof upon the plaintiff, Mr. Harmon, who must prove his case substantially as stated in the declaration, by a preponderance of all the evidence in the case before a recovery can be had."

This, of course, was a correct statement of the law, but inasmuch as the declaration contained the allegation "that the Tennessee Valley Electric Cooperative sprayed some deadly chemicals on vegetation in his (plaintiff's) pasture, along the power line, that this was poisonous chemicals, and that they, the Tennessee Valley Electric Cooperative, should have known by the exercise of reasonable care, that these chemicals were poisonous to cattle, and that as a direct and proximate result of the negligent act of the defendant, the Tennessee Valley Electric Cooperative, that the plaintiff's cattle became sick and three cows of the plaintiff's died, and in addition to that, the plaintiff was forced to spend sums of money for a veterinarian and carrying the cattle back and forth to the veterinarian, and other expenses connected with this incident, as a result of the Tennessee Valley Electric Cooperative using this deadly poison or poisonous chemicals on their power lines through Mr. Harmon's pasture"; We think the trial judge should have recognized that there was not even a scintilla of

evidence to sustain this material allegation of plaintiff's declaration, and should therefore, have granted the defendant's motion for a directed verdict.

As we view the evidence in this case, construed most strongly in favor of plaintiff's contentions, it establishes that the defendant did spray along its right-of-way through the pasture used by plaintiff's cattle, and that a few days thereafter, some of plaintiff's cattle became sick and three of his cows died. In addition, it can be fairly inferred from the testimony of Dr. Stroupe, that the cows were poisoned; but no witness connected or undertook to connect the poison as having been in the spray used by the defendant. On the contrary defendant's witnesses established that the sprays used were not poisonous, were purchased from reliable manufacturers, and that there were no other complaints about any cattle being injuriously affected except from the plaintiff and from a Mr. Worley whose cow was pastured in the same pasture with the cows of plaintiff. Mr. Worley's cow also died, had its insides removed and sent to the state chemical laboratory at Nashville for examination, with no finding of death by poison reported.

Defendant relies on the case of Quaker Oats Co. v. Davis, 33 Tenn. App. 373, 232 S. W. (2d) 282, 294. This was a case in which the tags had been mixed on two sacks of feed. Hog feed was tagged as "Full-O-Pep Broiler Mash", and as such, fed to the plaintiff's chickens, in that case. A large number of the chickens died— whereupon the plaintiff, Mrs. Davis, sued the Quaker Oats Company for damages for the loss of her chickens, claiming that the hog feed had caused their death. The defendant proved that the hog feed was not injurious to chickens, and was, indeed, used by some as chicken feed, and that there were other causes for the death of

the chickens. Although the Court held that it was negligent for the defendant to have mixed the tags on the feed, nevertheless, defendant's negligence did not cause the death of the chickens; and that the plaintiff had failed to establish any causal connection between the feeding of the hog feed to the chickens and their death. In reversing the lower court and dismissing the case on the ground that the trial judge should have sustained the defendant's motion for a directed verdict, the opinion of this court, written by Anderson, P. J., says:

"This is not a question of legal or proximate cause, as that phrase is known in the law of negligence, but one of causation in fact, which is a phase of the doctrine of 'proximate cause'. Being a question of fact, it reduces itself merely to the inquiry, 'Has the conduct of the defendant caused the plaintiff's loss?' It presupposes that the defendant's conduct was negligent and that the plaintiff was injured. It relates solely to the nexus between the two. Circumstantial evidence or expert testimony or both may provide a basis from which the requisite connection may be inferred. Where evidence of the former kind is relied upon, whether it furnishes a reasonable basis for the necessary inference must be tested by everyday experience.

\* \* \* \* \* \*

"Hence we think a directed verdict for the defendant was required by the absence of any substantial evidence to show a causal connection between the negligent act, i. e., the mislabeling of the feed, and the injury to the fowls."

We think the reasoning of the Court in the Quaker Oats Co. case, and the conclusion there reached, is ap-

plicable to the facts of the case at bar, and that the same result must follow. We therefore conclude that the trial judge should have sustained the motion of the defendant for a directed verdict, made both at the end of plaintiff's proof and, also, at the end of all the proof, and that the case should have been dismissed. It results that the motion for a directed verdict is, in effect, sustained in this Court and the case dismissed here.

The costs of this cause will be paid by the plaintiff and the surety on the cost bond.

Avery, P. J. (W.S.), and Carney, J., concur.