**Brenda Clark BENTON,
Plaintiff/Appellant,**

v.

**Edward SNYDER, M.D.,
Defendant/Appellee.**

Supreme Court of Tennessee,
at Knoxville.

Feb. 3, 1992.

Donna R. Davis, Olen G. Haynes, Knoxville, for plaintiff/appellant.

Edward G. White, II, Knoxville, for defendant/appellee.

## OPINION

ANDERSON, Justice.

The primary issue raised by this appeal is whether the plaintiff's malpractice action for battery based on sterilization without consent was barred by the statute of repose. That question turns on whether there was fraudulent concealment which extends the statute of repose. The Court of Appeals found that evidence of fraudulent concealment sufficient to create a jury issue could only be established by violating a well-settled Tennessee rule against drawing an inference from another inference. The trial court had directed a verdict in favor of the defendant surgeon on the ground that there was insufficient evidence to create a jury question on whether the defendant caused plaintiff's sterilization. The Court of Appeals disagreed, deciding that there was evidence that the defendant performed the sterilization sufficient to create a jury issue. However, the Court of Appeals affirmed the trial court's directed verdict on the separate ground that there was insufficient evidence of fraudulent concealment. We agree with the Court of Appeals' decision as to the sufficiency of the evidence of sterilization. We disagree, however, with their conclusion that the evidence of fraudulent concealment was legally insufficient to make a jury question. Accordingly, we reverse the Court of Appeals and remand this case for a new trial.

## FACTUAL HISTORY

More than eleven years ago, on February 4, 1980, the plaintiff, Brenda Clark Benton ("Benton"), was admitted to the Sweetwater Hospital in Sweetwater, Tennessee, for the birth of her child under the care of her family physician, Dr. William L. Harvey. During labor, fetal distress developed. As a result, Dr. Harvey consulted with the defendant Dr. Edward Snyder ("Snyder"), a general surgeon, and requested he perform an emergency cesarean section, to which Benton consented. After Dr. Snyder successfully performed the C-section, a healthy baby was born to Benton and she was discharged back to the care of Dr. Harvey.

Later, Benton married the child's father and they practiced birth control until 1984, when they decided to have another child. When she was unable to become pregnant, she discussed the problem with Dr. Harvey, who referred her in 1986 to Dr. Pleas R. Copas, a gynecologist. Dr. Copas performed a laparoscopy on August 28, 1986, which revealed that segments of her fallopian tubes were missing. Dr. Copas told Benton "that her tubes were blocked bilaterally and that the best course to pursue would be microsurgical correction of her tubes." He did not tell her he thought she had been surgically sterilized. He referred her to Dr. I. Ray King, an experienced gynecologic microsurgeon. On her initial visit in October of 1986, Dr. King informed Benton that it looked like portions of her fallopian tubes were missing and that she had probably been sterilized surgically. When he performed surgery to correct the condition, Dr. King found that both of her fallopian tubes had approximately one inch of tube missing. Dr. King successfully reconstructed the tubes, and Benton subsequently gave birth to another child.

On August 27, 1987, Benton filed a complaint, which alleged that Dr. Snyder sterilized her without consent during the cesarean section surgery on February 4, 1980, thereby committing battery, and thereafter fraudulently concealed his action.

At trial, Benton testified that she had no knowledge of ever having been sterilized until she was told by Dr. King, and that she had never consented to any sterilization procedure. Benton also testified that she had never undergone any surgical procedure during which she could have been sterilized except for the cesarean section performed by Dr. Snyder.

Dr. King, who surgically reconstructed Benton's fallopian tubes, testified that he thought she had been surgically sterilized. Dr. King said that he knew of no way segments of her fallopian tubes could have been missing due to accident or disease. Dr. King further testified that the division of her fallopian tubes could have been caused by either the palmeroy or bipolar cautery methods of sterilization. Dr. King described the palmeroy method as a process whereby the surgeon pulls up a knuckle of the fallopian tube, ties it off, and then cuts the top portion off the knuckle. According to Dr. King, it is preferable to use an absorbable suture in tying off the fallopian tube. The bipolar cautery method was described by Dr. King as a process whereby a small area of the fallopian tube is destroyed with an electrical surgical type of current. When asked his opinion, Dr. King stated he believed Benton had been sterilized with a variation of the palmeroy method.

Dr. Pleas R. Copas (the physician who referred Benton to Dr. King) reviewed the pathology report from Dr. King's reconstruction of Benton's fallopian tubes and, over the plaintiff's objection, gave his opinion as to how he thought she had been sterilized. Based on the absence of suture material from the scarred portions of fallopian tube removed by Dr. King, it was his opinion that Benton had been sterilized through the bipolar cautery method, rather than a variation of the palmeroy method.

When the defense called Dr. Snyder to the stand, he testified to his normal procedures in performing a cesarean section. Dr. Snyder said he performs a C-section by making an incision in the abdominal wall and the uterus, through which the baby is delivered, sewing up the incision with chromic (absorbable) sutures. The tissue removed is usually discarded, instead of being sent to the pathology lab, unless there have been complications with the delivery. This procedure, according to Dr. Snyder, takes approximately 25 to 35 minutes to perform.

Dr. Snyder also testified about his usual procedures in performing a tubal sterilization. He said that although he is familiar with the methods whereby only a portion of the fallopian tube is removed, such as the palmeroy or bipolar cautery methods, he always removes the entire fallopian tube by performing a salpingectomy. Once the tube is removed and the incisions are closed with chromic sutures, Dr. Snyder sends the tissue to the pathology lab to make sure that what has been removed is a fallopian

tube, rather than an ovarian ligament. This procedure, according to Dr. Snyder, takes an additional 15 to 20 minutes if it is performed incidental to a cesarean section.

Although he admitted that the fallopian tubes are within the operative site for a cesarean section, Dr. Snyder denied sterilizing Benton after he delivered her baby on February 4, 1980. He says he would have known if he had done it. Dr. Snyder also testified that he could not have sterilized Benton because only portions of her fallopian tubes were missing and he always removes the entire tube. In addition, Dr. Snyder said that he could not have sterilized Benton using bipolar cautery because Sweetwater Hospital did not have bipolar cautery equipment in 1980. Furthermore, he stated that he did not have time to remove the fallopian tubes because he performed Benton's C-section in the normal range of 25 to 35 minutes. To further support his position, Dr. Snyder pointed to the operating room record which states that no tissue was sent to the pathology lab after Benton's C-section delivery.

The operating room personnel who were present on the day Dr. Snyder delivered Benton's baby also testified. None of these witnesses had any independent recollection of Benton's C-section delivery. Each, however, reviewed the medical records and, based on what was contained in the record, denied that Benton was sterilized after her C-section delivery. They testified that they had never seen Dr. Snyder perform any sterilization procedure other than a salpingectomy. They also said that had he done so, they would have either seen Dr. Snyder perform the sterilization procedure, or they would have seen the fallopian tube in the course of transmitting the tissue to the pathology lab.

On the hospital operating room record, Benton's delivery is cited as "C-section, appendectomy," with "appendectomy" marked out and "error" written above it. When asked about the deleted reference to appendectomy, Dr. Snyder denied performing an appendectomy on Benton and stated that the reference was due to a clerical error. He admitted searching for the appendix but said he could not find it. He denied that he intended to perform an incidental appendectomy without consent; however, there was evidence that his practice at the time was to do the incidental procedure without consent.

In addition to Benton's specific hospital record, the entire operating room record of Sweetwater Hospital for the period in question was introduced into evidence. The record demonstrates that in some of Dr. Snyder's sterilization procedures, only portions of the fallopian tubes were sent to the lab, and that in one procedure performed by Dr. Snyder, no tissue was sent to the pathology lab. The record also shows that Dr. Snyder had scheduled one sterilization and appendectomy for February 4, 1980 (the same day Benton's C-section was performed), and another one for the very next day.

At the close of all the evidence, the trial court granted the defendant Snyder's motion for a directed verdict, holding that the jury could not reasonably differ on the question of whether Dr. Snyder performed a sterilization procedure on Benton. Although the trial court did not have to reach the question of whether there was sufficient evidence of fraudulent concealment, it found there was, concluding that the statute of repose would not bar Benton's suit against Dr. Snyder if there was proof that he had performed a sterilization procedure on her.

The Court of Appeals found that under the directed verdict standard of taking the strongest legitimate view of the evidence and disregarding all evidence to the contrary, it was reasonable to infer that Dr. Snyder performed the sterilization procedure. The Court of Appeals, however, found the evidence insufficient under the same directed verdict standard to establish fraudulent concealment. In so finding, the Court of Appeals said:

To establish fraudulent concealment from the evidence before the court, we must infer that Dr. Snyder performed the sterilization procedure. Secondly, we must go further and infer from this inference that Dr. Snyder knowingly failed

to document the procedure in the surgical records, knowingly concealed the procedure from the plaintiff and was therefore guilty of fraudulent concealment. This we cannot do. It is clear that competent proof cannot be established by an inference drawn from an inference. *Umstattd v. Metropolitan Life Ins. Co.*, 21 Tenn.App. 312, 110 S.W.2d 342 (Tenn. App.1937); *Pusser v. Gordon*, 684 S.W.2d 639 (Tenn.App.1984).

The appeal to this Court followed.

## SCOPE OF REVIEW

■ When we review a trial court's grant of a directed verdict on motion of a defendant, it is not our duty, or that of any appellate court, to weigh the evidence. *Cecil v. Hardin*, 575 S.W.2d 268, 271 (Tenn. 1978). Rather,

it is an appellate court's duty to look at all the evidence, take the strongest legitimate view of the evidence in favor of the opponent of the motion, allow all reasonable inferences to that party, discard all countervailing evidence and deny the motion where there is any doubt as to the conclusions to be drawn from the whole evidence. A verdict should be directed only where a reasonable mind could draw but one conclusion.

*Goode v. Tamko Asphalt Products, Inc.*, 783 S.W.2d 184, 187 (Tenn.1989).

■ As we review the evidence on the sterilization issue with that standard in mind, we observe that the undisputed proof at trial was that Benton had never undergone any surgical procedure during which she could have been sterilized, except for the cesarean section performed by Dr. Snyder; that she had no knowledge of ever having been sterilized; and that she never consented to any sterilization procedure. The plaintiff's medical proof demonstrated that she was sterilized and that her fallopian tubes were cut in the area of the operative site of the surgery performed by Dr. Snyder. Moreover, Benton's medical expert testified without contradiction that the missing sections of her fallopian tubes could not have resulted from another cause, such as accident or disease.

Taking the strongest legitimate view of this evidence and other evidence in the record, allowing all reasonable inferences in favor of the plaintiff, and discarding all countervailing evidence, we believe the jury could reasonably infer that Benton was sterilized during the surgery performed by Dr. Snyder. Accordingly, we agree with the Court of Appeals that Benton produced sufficient evidence that she was sterilized by Dr. Snyder to withstand a motion for directed verdict. We do not agree, however, with the Court of Appeals' conclusion that Benton impermissibly seeks to draw an inference from another inference in order to prove fraudulent concealment.

## FRAUDULENT CONCEALMENT

■ The statute of limitations for medical malpractice actions, Tenn.Code Ann. § 29–26–116 (1980), provides for a one-year statute of limitations, which "commences to run when the patient discovers, or in the exercise of reasonable care and diligence for his own health and welfare, should have discovered the resulting injury." *Teeters v. Currey*, 518 S.W.2d 512, 517 (Tenn.1974). The statute of limitations also contains a statute of repose which provides:

In no event shall any such action be brought more than three (3) years after the date on which the negligent act or omission occurred except where there is fraudulent concealment on the part of the defendant in which case the action shall be commenced within one (1) year after discovery that the cause of action exists.

Tenn.Code Ann. § 29–26–116(3) (1980). This three-year statute of repose does not begin to run upon discovery of the injury, but rather on the date of the allegedly negligent act. *Braden v. Yoder*, 592 S.W.2d 896, 897 (Tenn.App.1979).

■ As to whether plaintiff's action against the defendant is barred by the statute of repose, Dr. Snyder agrees that Benton is within the one-year statute of limitations because she filed her action within one year of discovering that she had been sterilized surgically. The defendant Sny-

der disagrees that Benton has met her burden of establishing fraudulent concealment on his part by material evidence. As Snyder correctly points out, in a case such as this, where a statute of repose defense has been asserted and established, the burden of proof shifts to the plaintiff to establish the exception to the statute being claimed. *Smith v. Southeastern Properties, Ltd.,* 776 S.W.2d 106, 109 (Tenn.App.1989); *Stockburger v. Ray,* 488 S.W.2d 378, 382 (Tenn.App.1972).

In order to meet the burden, a plaintiff who seeks to toll a statute of limitations on the ground of fraudulent concealment must prove that the cause of action was known to and fraudulently concealed by the defendant. *Ray v. Scheibert,* 224 Tenn. (2 Pack) 99, 104, 450 S.W.2d 578, 580 (1969). Knowledge on the part of the physician of the facts giving rise to a cause of action is an essential element of fraudulent concealment. *Ray v. Scheibert,* 484 S.W.2d 63, 72 (Tenn.App.1972). Concealment is also an essential element and it may consist of withholding information or making use of some device to mislead, thus involving act and intention. *Patten v. Standard Oil Co. of Louisiana,* 165 Tenn. (1 Beeler) 438, 443, 55 S.W.2d 759, 761 (1933).

Generally, a plaintiff seeking to establish fraudulent concealment must prove that the defendant took affirmative action to conceal the cause of action and that the plaintiff could not have discovered the cause of action despite exercising reasonable diligence. *Vance v. Schulder,* 547 S.W.2d 927, 930 (Tenn.1977). Generally, the affirmative action on the part of a defendant must be something more than mere silence or a mere failure to disclose known facts. There must be some trick or contrivance intended to exclude suspicion and prevent inquiry, *or else there must be a duty resting on the party knowing such facts to disclose them. Patten v. Standard Oil Co. of Louisiana,* 165 Tenn. (1 Beeler) 438, 443, 55 S.W.2d 759, 761 (1933). For example, such a duty arises where a confidential relationship exists, as between physician and patient. In such cases, *there is a duty to disclose, and that duty may render silence or failure to disclose known facts fraudulent. Hall v. De Saussure,* 41 Tenn.App. 572, 580–84, 297 S.W.2d 81, 86–87 (1956), *aff'd* 201 Tenn. (5 McCanless) 164, 297 S.W.2d 90 (1956). This is the rule in Tennessee and in other jurisdictions. *See, e.g., Lasoya v. Sunay,* 193 Ga.App. 814, 389 S.E.2d 339 (1989); *Borderlon v. Peck,* 661 S.W.2d 907 (Tex.1983).

Our review of the record demonstrates that there is material evidence sufficient to create a jury issue on the key elements of knowledge and concealment. The evidence of knowledge comes from Dr. Snyder's own testimony that he could not have cut Benton's fallopian tubes without knowing it. The evidence from which the jury could infer concealment consisted of the absence of documentation of the surgical sterilization procedure in Benton's medical records and Snyder's silence thereafter. The question remains, however, whether the evidence of fraudulent concealment sufficient to create a jury issue can only be established by impermissibly basing an inference on an inference.

## INFERENCES ON INFERENCES

An inference is generally regarded as a permissible deduction from evidence which a jury may accept or reject or accord such probative value as it desires. *Bell Cab & U–Drive–It Company, Inc. v. Sloan,* 193 Tenn. (29 Beeler) 352, 357, 246 S.W.2d 41, 44 (1952). Although a jury can permissibly draw an inference from the evidence before it, whether direct or circumstantial, it is well settled in Tennessee that an inference cannot be properly drawn from another inference. *Edenton v. McKelvey,* 186 Tenn. (22 Beeler) 655, 660, 212 S.W.2d 616, 618 (1948); *Pusser v. Gordon,* 684 S.W.2d 639, 649 (Tenn.App.1984). What is meant by this rule is that "[a]n inference can be drawn only from the facts in evidence, and cannot be based on surmise, speculation, conjecture, or guess; it must be reasonably drawn from, and supported by, the facts on which it purports to rest, and must be made in accordance with correct and common modes of reasoning."

*Patton v. L.O. Brayton & Co.,* 184 Tenn. (20 Beeler) 592, 598, 201 S.W.2d 981, 984 (1947) (quoting 32 C.J.S. *Evidence* § 1044, 1942). It should be noted that the rule has been roundly criticized by legal scholars and, as a result, some states have abandoned the rule, while in others qualifications and exceptions have developed.

One criticism has been that the rule is unworkable because all reasoning must proceed upon a series of inferences, and in everyday life all men frequently act as the result of the repeated piling of inferences upon inferences. *New York Life Ins. Co. v. McNeely,* 52 Ariz. 181, 79 P.2d 948 (1938). Another criticism is that the rule has been used carelessly and inaccurately by the courts as a convenient way of disposing of evidence which it regarded as too remote or uncertain to prove the ultimate facts at issue. Annotation, *Modern Status of the Rules Against Basing an Inference Upon an Inference or a Presumption Upon a Presumption,* 5 A.L.R.3d 100, 120–31 (1966); *Wigmore on Evidence,* § 41 (3d ed. 1940).

Despite the condemnation, a majority of jurisdictions [1] continue to follow the rule against basing an inference on an inference; however, several jurisdictions [2] in response to the critics have "abandoned" it.

However, the jurisdictions that have abandoned the rule have rejected its form, rather than its application. Accordingly, those jurisdictions continue to apply the rule; they have just changed the "label on the can" to a rule against drawing remote inferences. Annotation, *supra,* 5 A.L.R.3d at 120–31 (1966); *Wigmore on Evidence,* § 41 (3d ed. 1940).

Tennessee has qualified the general rule by adopting a rule that a fact may be inferred from circumstantial evidence, and from the fact thus inferred, another fact may be inferred without contravening the rule that an inference cannot be based

upon an inference. *Stinson v. Daniel,* 220 Tenn. (24 McCanless) 70, 80, 414 S.W.2d 7, 11 (1967); *Tennessee Valley Electric Co-op v. Harmon,* 39 Tenn.App. 580, 590, 286 S.W.2d 593, 597 (1956). What is meant by this rule is that "a 'fact,' although arrived at by indirect or circumstantial evidence, may serve as a basis for an inference; that is the evidence supporting the first inference may be of such a character and so strong that it justifies a conclusion or a finding of fact which becomes a proper basis for another inference." Annotation, *supra,* 95 A.L.R. 162 (citing *Nashville Gas & Heating Co. v. Phillips,* 17 Tenn.App. 648, 69 S.W.2d 914 (1934), and *Adamant Stone & Roofing Co. v. Vaughn,* 7 Tenn. App. 170 (1928)).

In this case, the plaintiff's proof fits within the latter, rather than the former, of these two Tennessee rules. As already established, Benton produced circumstantial evidence from which the jury could permissibly find as a fact that Dr. Snyder performed a sterilization procedure on Benton. From this inferred fact that Dr. Snyder performed the sterilization, together with (1) Snyder's statement that had he performed it he would have had to have known he did it, (2) the absence of documentation of the sterilization procedure by Snyder in Benton's medical records, and (3) Snyder's silence thereafter, the jury could permissibly draw an inference and find as a fact that Dr. Snyder fraudulently concealed the procedure from Benton.

Because the circumstantial evidence supporting the first inference is sufficiently strong, we conclude that the inferred fact (that Snyder performed the sterilization) can be the basis of the second inference of fraudulent concealment. Accordingly, we hold that the evidence of fraudulent concealment is legally sufficient and does not violate the rule that an inference may not be based on another inference.

1. Alabama, Arizona, Arkansas, Colorado, District of Columbia, Florida, Georgia, Idaho, Illinois, Kansas, Kentucky, Maine, Michigan, Montana, Nebraska, New Mexico, New York, North Carolina, Ohio, Oklahoma, Puerto Rico, Rhode Island, Texas, Tennessee, Utah, Vermont, Virginia, Washington, Wisconsin, Wyoming.

2. California, Connecticut, Florida, Georgia, Illinois, Indiana, Iowa, Maryland, Mississippi, Missouri, Montana, New Hampshire, New Jersey, Oregon, Pennsylvania, Texas.

It follows that, after taking the strongest legitimate view of plaintiff's evidence, discarding all countervailing evidence and allowing all reasonable inferences to the plaintiff, more than one conclusion could be drawn from the evidence. A verdict may be directed only where a reasonable mind could draw but one conclusion. Accordingly, we reverse the Court of Appeals' decision sustaining the trial court's directed verdict and remand the cause for a new trial.

Because of this remand, and in the interest of judicial economy, we are required to address two issues left undecided by the Court of Appeals opinion. The first question is whether the trial court erred in denying the plaintiff's motion for an order to review the medical records of all the patients who underwent sterilizations performed by Dr. Snyder. It is well settled that decisions with regard to pretrial discovery matters rest within the sound discretion of the trial court. The decision of the trial court in discovery matters will not be reversed on appeal unless a clear abuse of discretion is demonstrated. *Paine v. Ramsey*, 591 S.W.2d 434, 436 (Tenn.1979). We find no abuse of discretion, and the trial court's decision is affirmed.

The second issue is whether the trial court erred in allowing the testimony of Dr. Pleas R. Copas regarding the means by which Benton was sterilized. The plaintiff objected to Dr. Copas's testimony on the basis that it was speculative and inadmissible. On this record, we find Dr. Copas's testimony to be admissible and affirm the trial court's decision.

It results that the Court of Appeals' decision is reversed, and this cause is remanded to the trial court for a new trial. The costs of this appeal are taxed to the defendant.

REID, C.J., and DROWOTA, O'BRIEN, and DAUGHTREY, JJ., concur.