Ben GOODE and Wife Evelyn R.
Goode, Plaintiffs,

v.

TAMKO ASPHALT PRODUCTS, INC.,
and Warrior Roofing Manufacturing
Co., Defendants.

Supreme Court of Tennessee,
at Knoxville.

Dec. 4, 1989.

Rehearing Denied Jan. 22, 1990.

Art Roberts, Jr., Knoxville, for plaintiffs.

Earl R. Layman & James E. Wagner, Knoxville, for defendants Tamco Asphalt Prod.

Julia S. Howard, Knoxville, for defendants Warrior Roofing Mfg. Co.

FONES, Justice.

This is a products liability case wherein plaintiff claims he contracted a skin pigmentation condition diagnosed as vitiligo, as a result of using asphalt roof shingles and felt manufactured by defendants. No warning label alerting users of any potential danger appeared on the shingles or felt.

At the close of all the proof the trial judge granted defendants' motion for a directed verdict on the ground that there was no proof that the roofing products manufactured by defendants were either defective or unreasonably dangerous under the Tennessee Products Liability Act, T.C.A. § 29–28–101, et seq. The Court of Appeals reversed, holding that plaintiff's proof was sufficient to require submission to a jury the issue of whether defendants' products were unreasonably dangerous as defined in T.C.A. § 29–28–102(8), i.e., "to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." We granted the application of defendants for further review.

Plaintiff helped install a roof on his son's house, using asphalt shingles manufactured by Tamko and asphalt felt manufactured by Warrior. Plaintiff worked on the roof on two hot, sunny days in early July

1982. He testified that he did not wear gloves and had black smudges on his hands and arms at the end of the first day from handling the roofing materials. That night he had a tingling sensation in his hands and arms and the next morning he had blisters about the size of the blunt end of a pencil. The blisters on his arms and the back of his hands were apparently limited to the areas that his short sleeve shirt left exposed to sunlight. He testified that the blisters did not bother him, so he went to his son's house and worked on the roof another day under the same conditions as the first day.

In time, the blisters became white spots that increased in size. Dr. Huddleston, plaintiff's doctor, diagnosed his condition as a photo-toxic reaction to the asphalt materials that resulted in vitiligo. He explained that a photo-toxic reaction means that "some material on the skin reacts with light, usually sunlight in this case, to produce a chemical change." Vitiligo "means that cells that are supposed to produce pigment in an area of skin simply aren't there any more.——if you biopsy vitiligo very early there are fewer cells, if you biopsy it late the cells are gone." Dr. Huddleston was of the opinion that the loss of pigment was permanent, and was caused by plaintiff's handling of the asphalt products in combination with exposure to sunlight.

Dr. Huddleston testified that his opinion, that there was a relationship between plaintiff's handling the asphalt roofing materials and the loss of pigmentation, was based on the following factors:

A. The time relationship that I am given here, the known fact that petroleum products, asphalt, all that type of stuff, have multiple compounds in them some of which are known to act as bleaches on some people's skin. Phototoxic reactions where sunlight and these materials interact each other are all reasonable causes for the problem that he had.

When Dr. Huddleston was questioned about his actual knowledge of the chemical content of the products plaintiff had used he acknowledged that all he knew was that they were "supposed to be asphalt based, petroleum asphalt based", and, "petroleum base is where things like you can get various and sundry chemicals, many of which are carcinogenic as well as bleaches and other things?"

Dr. Huddleston was asked if he knew of any documented case in the annals of medical history of anyone getting vitiligo from exposure to asphalt products, and he answered as follows:

Q. There is no documented case in the annals of medical history to your knowledge of anyone getting vitiligo from any exposure to asphalt products?

A. There are multiple episodes of people getting vitiligo from hydroquinoes. Hydroquinoes are present in most petroleum based products. I would have to assume they are present in asphalt base as well.

The only other specific chemicals mentioned by Dr. Huddleston as components of petroleum based asphalt were anthramines and quinones. He failed to state what connection if any those compounds had with vitiligo, saying only that they were "known bleaches."

Plaintiff presented the testimony of James M. Green in support of his theory that plaintiff's vitiligo was caused by exposure to defendant's asphalt based products. Mr. Green testified that his profession was environmental engineer, that he had a B.S. degree in physical science, a master's in environmental health from East Tennessee State University, and a Master of Science in Engineering from the University of Tennessee.

Mr. Green was asked on direct examination to give the "components of petroleum asphalt." His response was:

[it] contains many complex components, and it would be best to break them down into class. The classes are essentially Benzopyrene derivatives as well as various very complex phenobic compounds, the phenols being a fairly substantial amount of the constituent of petroleum asphalt. The actual breakdown is quite complex, quite complex, so it would be better just to give you generic classes that I just did.

Mr. Green's testimony then turned to the question of whether petroleum asphalt had toxic potential for humans. He had consulted the literature reporting on studies "that have been generated by others and in those studies there has been shown to be a potential of toxicity for the general public by the Phenols and in particular the benzopyrene derivatives that are present in petroleum asphalt." He said that he went to the engineering and environmental health literature and pulled all the articles he could find where researchers had looked at the toxicity issue of petroleum asphalt. Four or five articles were then identified by title and author and made exhibits. However, Mr. Green did not testify about any specific content or studies reported in the articles. After the articles were introduced, Mr. Green was asked for his opinion as to whether it was "generally recognized" that "there are toxic potentials arising from exposure to petroleum asphalt or derivatives therefrom" and he responded as follows:

A. My opinion is the literature clearly shows that contact with petroleum asphalt can produce for a limited amount of the population an adverse dermatological reaction. The reaction can be various forms of dermatitis.

Later, he testified that it had been well known since 1959 that "exposure to the skin has a potential of causing dermatological reaction for a small segment of the population." He expressed the opinion that "if even a small segment of the population could potentially have dermatological problems from the use of a product then that should be put on a warning label and the use of gloves or other protective measures should be defined on the label."

On cross-examination, Mr. Green acknowledged that all but one of the articles or studies upon which he based his opinions involved experiments with rats, mice or guinea pigs. The one exception was an article entitled "A Health Survey of Petroleum Asphalt Workers", apparently authored by Baylor, et al., that appeared in the *Journal of Environmental Health*, August 1968. Mr. Green was asked if that article did not read that "the medical di-

rector of a large roofing manufacturer which employs one thousand workers in asphalt operations reported that during his 23 years as medical director no claim has ever been made against asphalt as a possible cause of ill health?" After identifying the page and the column Mr. Green read the citation and agreed that was what the article said. The same article reported that a medical survey of another roofing manufacturer that had 112 employees "revealed no evidence of any physical disability or ill health that could be attributed to asphalt."

Mr. Green was asked if he could testify that there was any recognized relation between vitiligo and petroleum asphalt and he responded that that was outside his area of expertise, that it was "something for a medical doctor." Mr. Green was asked if it was not true that all of the other articles upon which he had based his opinions, except the health survey of petroleum asphalt workers, dealt only with laboratory animals. His answer was, yes, but, "these other articles do have conclusions that are interpolated to the human species."

Kent Blanchard, manager of technical services for Tamko, testified for defendants. His education included a bachelor's degree in Biology and a master's degree in Public health with emphasis on environmental science from the University of Missouri.

Mr. Blanchard had read the article referred to above, "Health Survey of Petroleum Asphalt Workers," and he read excerpts from the article that had not been specifically dealt with during Mr. Green's testimony. The article reported that the health of a group of 462 asphalt workers was compared to that of a control group of 379 persons that did not have exposure to petroleum asphalt. All persons in the asphalt workers group had been engaged in asphalt work a minimum of five years, and the group averaged 15.1 years. The results of the survey were that there was no significant difference in the health of the two groups and they found no evidence that petroleum asphalt constituted a health hazard. The health survey resulted in the following conclusion:

Like many other materials and chemicals in industrial use today, asphalt should be kept under surveillance and handled accordingly, but at the present time, petroleum asphalt cannot rationally be considered a hazardous substance.

Of all the 841 persons examined in the asphalt group and the control group only one person was found to have vitiligo and that person was in the control group.

Mr. Blanchard and the president of Warrior Roofing, Robert Larue, testified that they knew of no previous complaint of vitiligo or skin problems as a result of handling their roofing products by their thousands of customers or more than a thousand employees.

There is no disagreement with the proposition that this case is controlled by the Tennessee Products Liability Act of 1978. Plaintiff's theory of recovery in this case is that defendants were guilty of a negligent breach of duty to warn of the non-apparent danger associated with the use of their roofing products. A failure to discharge a duty to warn, whether negligent or innocent, is expressly included in the definition of a products liability action in T.C.A. § 29–28–102(6). T.C.A. § 29–28–105(a) provides that to impose liability on a manufacturer it must be shown that the product was in a defective condition, or an unreasonably dangerous condition, at the time it left the manufacturer's control. In this case there is no contention that the products were in a defective condition. Thus, the issue is whether defendant's roofing products were in an unreasonably dangerous condition at the time the products left the control of each manufacturer. It follows that if the products were unreasonably dangerous, defendants had a duty to put an appropriate warning on the labels, but if the products were not unreasonably dangerous, the law imposes no duty to warn.

The definition of "unreasonably dangerous" that is applicable to the facts in this case is the following portion of T.C.A. § 29–28–102(8):

(8) "Unreasonably dangerous" means that a product is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics, ...

The Court of Appeals reversed the trial judge's grant of a directed verdict at the close of all the proof and remanded for a new trial because that court held plaintiff had presented sufficient proof that defendant's products were unreasonably dangerous and required a warning to users. Thus the issue before us is confined to whether plaintiff's proof rises to the level necessary to submit the unreasonably dangerous issue to the jury.

We agree with the trial judge's express finding that reasonable minds could reach but one conclusion, that plaintiff had failed to prove defendant's products were unreasonably dangerous.

In reviewing a trial court's action on a motion for a directed verdict, it is an appellate court's duty to look at all the evidence, take the strongest legitimate view of the evidence in favor of the opponent of the motion, allow all reasonable inferences to that party, discard all countervailing evidence and deny the motion where there is any doubt as to the conclusions to be drawn from the whole evidence. A verdict should be directed only where a reasonable mind could draw but one conclusion. *Crosslin v. Alsup*, 594 S.W.2d 379, 380 (Tenn.1980).

The most that can be said for Dr. Huddleston's testimony is that it established a causal connection between plaintiff's vitiligo and the use of defendant's products. However, it was noteworthy for another reason, it presented the only case in medical history, insofar as this record reveals, of a human being sustaining any skin problem or ill health of any nature from the use of asphalt roofing products.

Thus, plaintiff is dependent upon Mr. Green's testimony for evidence that defendant's roofing products are unreasonably dangerous. Mr. Green opined that a "limited amount of the population" or a "small segment of the population" could "poten-

tially" have skin problems from the use of petroleum asphalt. His opinion was based entirely upon articles written by persons whose last names were sometimes given and sometimes not. Mr. Green was asked if he considered the articles "authoritative" and he responded in the affirmative. The qualifications of education and experience of the various authors of the articles were not given, nor the details of surveys, experiments, data collection, etc., contained in the articles, nor any of the specific conclusions reached in the articles. What the record does reveal is that plaintiff's expert relied upon conclusions reached by others based on experiments with laboratory animals interpolated to the human species. We are of the opinion that the articles and data upon which Mr. Green relied are totally lacking in trustworthiness and without any indicia of reliability, as presented in this record. But, if given full face value, his opinion would fail to rise to the level of creating a jury issue, in this case, because of the undisputed fact that no human in medical history has contracted vitiligo from the use of petroleum asphalt prior to plaintiff, plus the findings of the health study of petroleum workers, that completely refutes the experiments with animals interpolated to the human species, upon which he based his opinion of the "potential" harm to a small number of humans. On this record no reasonable person could find that defendant's roofing products were unreasonably dangerous, in July 1982, as defined in the statute.

The judgment of the Court of Appeals is reversed and the judgment of the trial court dismissing plaintiff's suit is affirmed. Costs are adjudged against plaintiff.

DROWOTA, C.J., and COOPER, HARBISON and O'BRIEN, JJ., concur.