IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
MARCH 20, 2001 Session

## SUZANNE W. GIBSON, ET AL v. JAMES E. PROKELL

**Direct Appeal from the Chancery Court for Shelby County**
**No. 103880-1; The Honorable Walter L. Evans, Chancellor**

_____

**No. W2000-01236-COA-R3-CV - August 15, 2001**

_____

This is the fourth time that an aspect of this domestic dispute has come before this court. Both parties appeal and raise numerous issues, primarily involving child support and visitation. For the reasons set forth herein, we affirm in part, reverse in part, and remand to the court below for further proceedings consistent with this opinion.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Reversed in Part and Remanded**

ALAN E. HIGHERS, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S. joined, and DAVID R. FARMER, J. concurred separately,.

Scott B. Peatross, Memphis, for Appellant

Felix H. Bean, III, Memphis, for Appellee

**OPINION**

**Facts and Procedural History**

This is a domestic dispute primarily involving visitation and child support issues. The parties, Mr. Prokell and Mrs. Gibson, were divorced in Pittsburgh, Pennsylvania, in September 1993. Mr. Ralph Gibson is Mrs. Gibson's current husband, and he is also an attorney who has at various times represented Mrs. Gibson in this case. Mrs. Gibson now resides in Memphis, Tennessee, and Mr. Prokell still resides in Pennsylvania. The parties have one minor child, Maxfield Prokell (Max), who was born on March 31, 1987. Primary custody of Max was given to Mrs. Gibson by the Pennsylvania court, and Mr. Prokell was granted liberal visitation. On January 4, 1994, a Consent Order of Court was entered in Pennsylvania. The court, among other things, set Mr. Prokell's child support at $250.00 and required Mr. Prokell to pay all transportation expenses for visitation.

On February 16, 1994, in Tennessee, the chancery court entered an Order Limiting Telephone Calls and Suspending Visitation Rights Pending a Hearing on this Matter. On November 22, 1994, after a jurisdictional issue was decided, the Tennessee chancery court order was reinstated pending a full evidentiary hearing on Petitioner's Petition for Respondent to Show Cause Why His Visitation Rights Should Not Be Revoked.

On June 7, 1995, the chancery court entered an agreed order, which set out liberal visitation between Mr. Prokell and Max. On November 29, 1995, the trial court entered an Order Granting Petition for Contempt. Mr. Prokell was found to be in contempt of the court's June 7, 1995, order for the following reasons:

1) having inappropriate conversations with Max that show animosity and hostility towards Mr. and Mrs. Gibson and cause Max to feel insecure about his home environment in Memphis; 2) discussing ongoing and past legal proceedings with Max; 3) harassing, browbeating, manipulating, and intimidating professionals involved in the case to get them to intercede on his behalf; 4) refusing to follow the court's order that he engage in regular, frequent individual psychotherapy and that he cooperate with and follow all recommendations of his psychotherapist and Dr. Dixon, Max's child psychologist; and 5) relentlessly attempting to get more visitation than the court's order allows.

On December 22, 1995, the court entered an Order Awarding Sanctions for Failure to Comply with Order Compelling Discovery, Granting Interim Increase in Child Support Pending a Full Hearing, and Accepting Jurisdiction Over Child Support Issues. In this order, Mr. Prokell's child support was increased from $250.00 per month to $500.00 per month.

On June 6, 1996, the court entered an Order Setting Permanent Support and Reducing Arrearages to Judgment. Due to Mr. Prokell's failure to cooperate in the discovery process, the trial court found that permanent child support should be set based on Mr. Prokell's 1995 admitted total revenue of $102,214.82, less a deduction only for taxes in the amount of $11,257.00. Therefore, the court found Mr. Prokell's net income to be $90,957.82 and set his child support payments at 21%, which amounted to payments of $1,591.76 per month. The trial court made the $1,591.76 monthly child support payment retroactive to March, 1995, and the trial court also reduced child support arrearages to $20,879.77. In making its decision, the trial court specifically found that Mr. Prokell had willfully and deliberately failed to comply with the court's orders compelling discovery and granting sanctions. The trial court found that Mr. Prokell's non-compliance was evidenced by his failure to file a correct formal response to Mrs. Gibson's first request for production of documents, by his failure to produce numerous documents necessary to calculate child support, and by his refusal to appear at his deposition. On June 14, 1996, an Order was entered requiring supervised visitation pending a full hearing.

On August 13, 1996, an Order of Contempt was entered because Mr. Prokell failed to make the June 1996 child support payment timely, and because he only paid $500.00 of the July 1996 support payment of $1,591.74. Mr. Prokell was also sentenced to ten days in jail, and a warrant was issued for his arrest. On May 9, 1997, a judgment for child support arrears was entered in the

amount of $13,845.50. Mr. Prokell appealed to this court, and we affirmed the trial court on December 10, 1997.

The case sat dormant until 1999, when Mr. Prokell filed a motion entitled James E. Prokell's Motion for Specific Visitation, to Reevaluate Temporary Order of 6-14-96 and for Reduction in Child Support. Mr. Prokell was being inducted into the Edinboro University Athletic Hall of Fame for college basketball, and he wanted Max to attend the ceremony. The Order on Motion for Visitation was entered on April 28, 1999, *nunc pro tunc* to April 21, 1999. The Order permitted Mr. Prokell to have visitation with Max during his induction to the Edinboro University Athletic Hall of Fame. The Order also instructed Mrs. Gibson to render an accounting of all monies collected from Mr. Prokell. As a result, Mrs. Gibson filed a statement claiming that she had collected $17,204.85 from Mr. Prokell. After attorneys' fees, Mrs. Gibson claimed a net recovery of $10,357.99. On June 10, 1999, Mr. Prokell filed a petition for contempt due to the Gibsons' failure to send Max to Pennsylvania for the induction ceremony as ordered by the court.

On September 2, 1999, the trial court granted Mr. Prokell visitation with Max over Labor Day weekend. That same day, this court stayed the Labor Day visitation Order.

The trial was conducted on November 1 and 2, 1999. On May 19, 2000, the trial court entered its final order granting Mr. Prokell's Motion for Specific Visitation and to Reevaluate Temporary Order of 6-14-96 and for Reduction in Child Support and granting Mr. Prokell other equitable relief. Specifically, the trial court ruled that 1) Mr. and Mrs. Gibson were in willful contempt of court for failure to allow Max reasonable visitation with Mr. Prokell; 2) there was no basis for the court to recuse itself; 3) Mr. Prokell's appearance in the trial court on November 1 and 2, 1999, and the fact that he turned over certain documents purged Mr. Prokell of contempt; 4) Mr. Prokell's child support was reduced to $672.50 per month based on a $52,500.00 annual income, with $500.00 of each monthly payment to be applied to Mr. Prokell's arrears; 5) the child support arrearages should be modified; 6) none of Mr. Prokell's child support arrearages shall accrue interest, and; 7) liberal, unsupervised visitation between Mr. Prokell and Max shall be reinstated, and Mrs. Gibson shall pay one-half of the expenses of visitation. Mrs. Gibson filed her notice of appeal on May 24, 2000.

The Gibsons present the following issues, as quoted from their brief, for our review:

1. Did the trial court err in denying Mrs. Gibson's motion to deny Mr. Prokell any relief until Mr. Prokell purges himself of contempt of the trial court's visitation and child support orders, which were affirmed by this court?
2. Did the trial court err in failing to deny Mr. Prokell's motion for modification because the motion should have been filed as a petition for modification with service of process issued and served on Mrs. Gibson and because Mr. Prokell's motion failed to state a claim upon which relief could be granted?
3. Did the trial court err in refusing to recuse itself?

4.  Did the trial court err in refusing to follow the law of the case established by this Court's opinions and orders dated December 10, 1997, and September 3, 1999, and, instead, in ruling that final orders of the trial court entered by the former Chancellor and affirmed by this Court were "unconscionable," thereby justifying the trial court's decision to retroactively modify the final child support and supervised visitation orders entered in 1996 without finding a material change of circumstances?

5.  Did the trial court err in adjusting Mr. Prokell's current monthly child support payment downward by $500.00 per month as a downward deviation from the child support guidelines necessitated, in the trial court's opinion, by the "unfair" child support amount assessed against Mr. Prokell by the prior Chancellor and affirmed by this Court?

6.  Did the trial court err in retroactively modifying child support for an extensive period prior to Mr. Prokell's filing of a request for modification and in refusing to assess 12% per annum interest on the child support arrears as required by Tenn. Code. Ann. § 36-5-101(a)(5)?

7.  Did the trial court err in modifying a 1994 Pennsylvania decree which required Mr. Prokell to pay all visitation expenses?

8.  Did the trial court err in holding Mr. Gibson, who was not a party to the proceedings, and Mrs. Gibson in contempt for failing to allow Mr. Prokell unsupervised visitation when, in fact, the June 14, 1996 order required supervised visitation?

9.  Did the trial court commit numerous procedural errors (1) by refusing to allow Mrs. Gibson proper discovery; (2) by allowing Mr. Prokell's purported expert witness, Mr. Levy, to testify despite the fact that Mr. Prokell failed to provide the requested discovery regarding any expert witnesses he would offer at the hearing and despite the fact that Mr. Levy was incompetent to testify as to recommendations for the parties' minor child; (3) by refusing to allow Mrs. Gibsons's counsel to cross-examine Mr. Levy regarding the fees Mr. Levy was charging Mr. Prokell to testify; (4) by admitting into evidence a hearsay letter from a psychiatrist without requiring trial or evidentiary deposition testimony from the psychiatrist; and (5) by refusing to read and consider the evidentiary deposition of the court-appointed child psychologist, Dr. Stacey Lynn Dixon, which was taken just two days before the trial?

In addition, Mr. Prokell presents the following three issues, as quoted from his brief, for our review:

1.  Is the natural father who was awarded "partial custody" of a 13-year-old male child entitled to specific visitation with that child?

2.  Should the amount of child support to be paid by a non-resident father be set in accordance with the Tennessee Child Support Guidelines under a "significant variance" test?

3.  Did the Trial Court have a reasonable basis upon which to have sustained Mr. Prokell's Petition seeking to cite Mrs. Gibson for contempt, as well as the sua sponte finding Attorney Ralph Gibson (Mrs. Gibson's husband) was in contempt of the orders of Court?

We will address each issue in turn.

**Standard of Review**

When a civil action is heard by a trial judge sitting without a jury, our review of the matter is *de novo* on the record, accompanied by a presumption of correctness of the findings below. See Foster v. Bue, 749 S.W.2d 736, 741 (Tenn. 1988); TENN. R. APP. P. 13(d). We may not reverse the findings of fact made by the trial judge unless they are contrary to the preponderance of the evidence. See Jahn v. Jahn, 932 S.W.2d 939, 941 (Tenn. Ct. App. 1996). This presumption of correctness, however, does not attach to the trial judge's legal determinations or the trial court's conclusions that are based on undisputed facts. See NCNB Nat'l Bank v. Thrailkill, 856 S.W.2d 150, 153 (Tenn. Ct. App. 1993).

**Law and Analysis**

First, Mrs. Gibson argues that the trial court erred in granting Mr. Prokell any relief due to his failure to purge himself of contempt. Although the trial court explicitly purged Mr. Prokell of contempt in its final order, Ms. Gibson argues that the chancellor erred in purging Mr. Prokell of contempt because Mr. Prokell had not completely complied with the court's previous orders. We disagree. The trial court has discretion over the fixing of conditions upon which the contemnor may purge himself. See Busch v. Berg, 384 N.Y.S.2d 301, 303 (N.Y. App. Div. 1976). Moreover, "[a] court may permit a person adjudicated in contempt of its order to purge himself or herself of the contempt in such manner as it deems proper and advisable." 17 C.J.S. *Contempt* § 121 (1999). We find that the chancellor did not abuse his discretion in purging Mr. Prokell of contempt. Therefore, this issue is without merit.

Next, Mrs. Gibson argues that the trial court erred in failing to deny Mr. Prokell's motion for modification. Mrs. Gibson argues that the motion should have been filed as a petition for modification with service of process issued and served on Mrs. Gibson. Furthermore, Mrs. Gibson avers that Mr. Prokell's motion failed to state a claim upon which relief could be granted. Mrs. Gibson has not provided us with any authority that states that a Petition for Modification must be filed. Additionally, our own research leads us to no such conclusion. As a result, we find that the trial court did not err in entertaining Mr. Prokell's motion for relief.

Mrs. Gibson also claims that service of process should have been issued and served on her. We note that Mrs. Gibson was provided with notice on April 15, 1999, by hand delivery, and the hearing was not set until April 21, 1999. The court of appeals has stated that:

> Since jurisdiction is continuing, notice requirements upon commencement of an action to modify or enforce the decree are not so stringent as those for a new action. All that is required is that the adverse party be given "reasonable notice," that is, "such as one desirous of actually informing the absent party might reasonably adopt."

Jarvis v. Jarvis, 664 S.W.2d 694, 696 (Tenn. Ct. App. 1983) (internal citations omitted). Under the unique facts of the instant case, we find that Mrs. Gibson was provided with sufficient notice. We also find that the motion stated a claim upon which relief could be granted.

Next, Mrs. Gibson asserts that the trial court erred in refusing to recuse itself. Ms. Gibson points to several statements made by the chancellor and alleges that the chancellor was biased or prejudiced against her. Our supreme court has stated that all litigants are entitled to the "cold neutrality of an impartial court." Davis v. Liberty Mut. Ins. Co., 38 S.W.3d 560, 564 (Tenn. 2001). A trial before a biased or prejudiced judge is a denial of due process. See Wilson v. Wilson, 987 S.W.2d 555, 562 (Tenn. Ct. App. 1998). Judges must conduct themselves "at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." TENN. S. CT. R. 10, Canon 2(A). Judicial recusal is called for "when an ordinary person in the judge's position, knowing all the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality." Davis, 38 S.W.3d at 564. In the present case, we note that the Motion to Recuse Chancellor was filed on May 8, 2000, which was over six months after the trial. We also note that requests for recusal are left primarily to the sound discretion of the court. See State v. Hines, 919 S.W.2d 573, 578 (Tenn. 1995). We will not interfere with a court's decision regarding recusal unless it is clear that the court has abused its discretion. See id. Under the unique circumstances of the instant case, we do not find that the refusal of the chancellor to recuse himself was an abuse of discretion. Accordingly, this issue is without merit.

Fifth, Mrs. Gibson asserts that the trial court erred in refusing to follow the law of the case established by this court's orders of December 10, 1997, and September 3, 1999. Specifically, Mrs. Gibson argues that the trial court erred in retroactively modifying child support and supervised visitation orders without finding a material change of circumstances.

**Visitation**

This court has stated that "[t]he custody and visitation of minor children are some of the most sensitive issues that confront a trial court in a divorce case." Brewster v. Brewster, 2001 WL 401600, at *3 (Tenn. Ct. App. Apr. 23, 2001) (citing Gaskill v. Gaskill, 936 S.W.2d 626, 630 (Tenn. Ct. App. 1996)). Moreover, "[c]ustody and visitation arrangements are within the discretion of the trial court, but trial courts must base decisions on the proof and appropriate law and principles. In reviewing custody and visitation cases the welfare of the children involved is paramount, and the right of a non-custodial parent to reasonable visitation is clearly favored." Id. (internal citations omitted). Tennessee courts have recognized that non-custodial parents have a fundamental right to visitation. See TENN. CODE ANN. § 36-6-301 (Supp. 2000).

In the instant case, Mrs. Gibson asserts that the trial court erred because it did not find a "material change of circumstances" to justify changing supervised visitation. At this juncture, we must now address another issue raised by Mrs. Gibson. Specifically, Mrs. Gibson alleges that the trial court erred by refusing to read and consider the evidentiary deposition of the court appointed

child psychologist, Dr. Stacey Lynn Dixon. Mrs. Gibson cites the case of <u>Integon Indemnity Corp.</u> <u>v. Flanagan</u>, No. 02A01-9812-CH-00382, 1999 WL 492656, at *1 (Tenn. Ct. App. Jul. 13, 1999). In <u>Integon</u>, this court addressed a similar issue arising out of a case from Chancellor Evans' court. Counsel for Integon was trying to show a videotape deposition when the following exchange took place:

> INTEGON'S COUNSEL: Is the court telling me I can't show that [a videotape of Charlotte Tackash's deposition], put that into evidence? The problem that I'm concerned about is that I have evidence that I'm not being allowed to put in.
>
> THE COURT: Well, what evidence are you not being allowed to put in?
>
> INTEGON'S COUNSEL: Videotaped deposition testimony.
>
> THE COURT: But you've summarized the strong points of her testimony. Is there anything which you have not stated that her video would disclose that you wish to advise the court?
>
> INTEGON'S COUNSEL: If Your Honor please, it's a 70-page deposition and I can't – with all due respect to the Court, it's unfair to ask me to stipulate to all of the things that might be pertinent in that deposition.

<u>Id.</u> at *2. The trial court did not allow Integon's counsel to enter the deposition into evidence. <u>See</u> <u>id</u>. Instead, the trial court required counsel to summarize the strong points of the deposition. <u>See</u> <u>id.</u> The trial court then proceeded to rule upon the merits of the case based upon counsels' opening statements. <u>See id.</u> We concluded that the trial court erred in not fully considering the deposition testimony. <u>See id.</u>

In the instant case, the following exchange occurred during the trial regarding Dr. Dixon's deposition:

> THE COURT: Well, I'm sure Mr. Peatross is going to call the Court's attention to whatever portion of the deposition, I assume, that you are relying on rather that just submitting the entire deposition.
>
> MR. PEATROSS: Well, we took this on Saturday, and every question I asked is relevant to the proceedings here. . . .
>
> THE COURT: Is there something that you want to call the Court's attention to particularly in the deposition?

MR. PEATROSS: No, Your Honor. The entire thing – my entire direct examination is very important.

. . .

MR. PEATROSS: Did Your Honor read the deposition of Dr. Dickson [sic]?

THE COURT: No, but the Court feels that Dr. Dickson's [sic] report is not relevant at this point. . . .

While it is true that Dr. Dixon had not seen any of the parties in over three years, we disagree with the trial court's statement that there is no relevant information in Dr. Dixon's deposition. Just as we held in Integon, we conclude that the trial court erred in not reading and considering the evidentiary deposition. Therefore, we remand to the trial court with instructions to consider Dr. Dixon's deposition in its entirety before ruling on the visitation issue.

**Child Support**

Mrs. Gibson also asserts that the trial court committed several errors regarding child support. First, Mrs. Gibson avers that the trial court erred in retroactively modifying Mr. Prokell's arrearages. Mr. Prokell filed his Motion for Reduction in Child Support on April 15, 1999. In its final order, the trial court retroactively modified arrears from May, 1998, through April, 1999. Section 36-5-101(a)(5) of the Tennessee Code states, in relevant part, that "[child support arrearages] shall not be subject to modification as to any time period or any amounts due prior to the date that an action for modification is filed and notice of the action has been mailed to the last known address of the opposing parties." TENN. CODE ANN. § 36-5-101 (a)(5) (Supp. 2000); see also Rutledge v. Barrett, 802 S.W.2d 604, 606-07 (Tenn. 1991). Accordingly, we find that the trial court erred in retroactively modifying Mr. Prokell's child support arrearages prior to the date of April 15, 1999, which was the date his Motion for Reduction in Child Support was filed. Therefore, on remand, the trial court must reinstate the arrearages that accrued under prior orders through April 15, 1999.

Mrs. Gibson also avers that the trial court erred in declaring that all of Mr. Prokell's arrearages are to be paid without the accrual of interest. Section 36-5-101(a)(5) of the Tennessee Code states that "[i]f the full amount of child support is not paid by the date upon which the ordered support is due, the unpaid amount is in arrears and shall become a judgment for the unpaid amounts and **shall accrue interest from the date of the arrearage at the rate of twelve percent (12%) per annum**." TENN. CODE ANN. § 36-5-101(a)(5) (Supp. 2000) (emphasis added). The aforementioned language is clearly mandatory regarding the accrual of interest on arrearages. Therefore, we find that the trial court erred in holding that Mr. Prokell's arrearages shall be paid without the accrual of interest.

Next, Mrs. Gibson asserts that the trial court erred in adjusting Mr. Prokell's current monthly child support payment downward by $500.00 per month as a downward deviation from the child support guidelines. While the trial court's findings of facts are entitled to a presumption of correctness on appeal, the lower court's discretion is tempered by the child support guidelines. See TENN. R. APP. P. 13(d); Jones v. Jones, 930 S.W.2d 541, 544 (Tenn. 1996). Statutory authority provides for a rebuttable presumption that the percentage amount of child support provided in the guidelines is the correct amount. However, "[the guidelines] are subject to deviation upward or downward when the assumptions on which they are based do not pertain to a particular situation." Nash v. Mulle, 846 S.W.2d 803, 805 (Tenn. 1993). In order to justify a downward deviation from this amount, the trial court must make written findings outlining the reasons for this deviation. These reasons must show that the deviation is either in the best interest of the child; that the child support guidelines would be unjust or inappropriate; or needed to maintain equity between the parties.[1] The Tennessee Supreme Court discussed when such deviations were acceptable in Jones:

> While § 36-5-101(e)(1) does authorize deviation in order to ensure equity between the parties, and while downward deviation is clearly not prohibited, the trial court's authority to do so must be considered in light of the provisions dealing with such deviation--Rule 1240-2-4-.04(2) and (4). Although not exclusive, those subsections provide for downward deviation in three instances: (1) where DHS has taken custody of the child(ren) pursuant to a neglect, dependency, or abuse action; (2) where the child(ren) spend more visitation time with the obligor than is assumed by the guidelines; and (3) in cases in which the obligor is subjected to an "extreme economic hardship," such as where other children living with the obligor have extraordinary needs. Therefore, the guidelines expressly provide for downward deviation where the obligee has utterly ceased to care for the child(ren); where the obligee clearly has a lower level of child care expense than that assumed in the guidelines; and where the obligor is saddled with an "extreme economic hardship." Although

---

[1] Section 36-5-101(e)(1) of the Tennessee Code states the following:

> In making its determination concerning the amount of support of any minor child or children of the parties, the court shall apply as a rebuttable presumption the child support guidelines as provided in this subsection. If the court finds that evidence is sufficient to rebut this presumption, the court shall make a written finding that the application of the child support guidelines would be unjust or inappropriate in that particular case, in order to provide for the best interest of the child(ren) or the equity between the parties. Findings that the application of the guidelines would be unjust or inappropriate shall state the amount of support that would have been ordered under the child support guidelines and a justification for the variance from the guidelines.

TENN. CODE ANN. § 36-5-101(e)(1) (Supp. 2000).

> the rule does not purport to set forth an exhaustive list of instances in which downward deviation is allowed, these specific instances nevertheless are a powerful indication as to the types of situations in which it is contemplated under the guidelines.

Jones, 930 S.W.2d at 545.

In the case at bar, the trial court based its deviation from statutory guidelines on "the inequity that exists in the amount of child support that was unfairly imposed upon Prokell initially." We must remember that child support determinations are made with the child's best interests in mind, not the best interests of the custodial and non-custodial parents. Upon review, we find no adequate justification for the downward deviation in the amount of $500.00 per month. Therefore, the trial court is reversed on this issue.

Next, Mrs. Gibson argues that the trial court erred in modifying a 1994 Pennsylvania decree that required Mr. Prokell to pay all visitation expenses. The court below assessed one-half of the visitation expenses to Mrs. Gibson. We have addressed this issue before in Reznicek v. Reznicek, 1991 WL 156407, at *1 (Tenn. Ct. App. 1991). There, we held that the trial court must first consider evidence of the parties' respective financial resources before allocating visitation expenses. See id. at *5. In the instant case, the record is void of any such consideration by the court below. Therefore, we set aside the allocation as made and remand this aspect to the trial court to hear evidence regarding the financial resources of both Mrs. Gibson and Mr. Prokell. After hearing and considering the evidence, the trial court is directed to make such allocation, as in its opinion, the proof dictates.

Next, Mrs. Gibson asserts that the trial court erred when it held her and Mr. Gibson, who is a non-party, in contempt. The contempt arose from a dispute over the court's order that provided Mr. Prokell with visitation with Max in Pennsylvania in order to attend the Edinboro Athletic Hall of Fame induction ceremony. Apparently, the Gibsons objected to specific provisions of the order as drafted. Specifically, the Gibsons alleged that the order had three additions that were not authorized by the court. As a result, the Gibsons did not send Max to Pennsylvania to accompany Mr. Prokell to the induction ceremony. We note that "though the phraseology of the decree violated may be inartificial and obscure, it does not excuse the party, if the spirit and intent of the decree are manifest and free from doubt." 7 TENN. JUR. *Contempt* § 5 (1997) (citing Blair v. Nelson, 67 Tenn. (8 Baxt.) 1 (1874)). Moreover, "[t]he authority to punish for contempt is inherent in the office of chancellor, and a determination of the question whether his orders have been disobeyed or his dignity insulted is a prerogative peculiarly personal to the chancellor." Id. (citations omitted). While there may have been some questions regarding the minute details of the ordered visit, there is no doubt that the spirit and intent of the decree was that Max was to be sent to Pennsylvania to attend the induction ceremony with his father. Nevertheless, the Gibsons disregarded the court's ruling and did not send Max to Pennsylvania. Upon review of the record, we find that the chancellor did not abuse his discretion in holding Mrs. Gibson in contempt, since the order was directed to her as the

-10-

custodial parent. Mr. Gibson is not a custodial parent and is not a party to the proceedings. That portion of the order finding him in contempt is reversed.

In Mrs. Gibson's final issue, she asserts that the trial court committed numerous procedural errors. First, Mrs. Gibson argues that the trial court erred by refusing to allow her proper discovery. Specifically, Mrs. Gibson argues that the trial court erred in allowing Mr. Levy to testify because Mr. Prokell only stated in discovery that Mr. Levy would testify as to the love Mr. Prokell has for his son. However, Mr. Levy testified about a broader range of issues. Therefore, Mrs. Gibson argues that Mr. Levy should not have been allowed to testify. We note that "[t]he decision of the trial court in discovery matters will not be reversed on appeal unless a clear abuse of discretion is demonstrated." Benton v. Snyder, 825 S.W.2d 409, 416 (Tenn. 1992). In the instant case, we find no abuse of discretion regarding the chancellor's rulings on discovery matters. Therefore, the trial court's decision to allow Mr. Levy to testify is affirmed.

Mrs. Gibson also argues that the trial court erred in refusing to allow her counsel to cross-examine Mr. Levy regarding the fees he was charging Mr. Prokell to testify. We find that this was harmless error that did not affect the result. Therefore, we are compelled to affirm the judgment below on this basis. See Bass v. Barksdale, 671 S.W.2d 476 (Tenn. Ct. App. 1984); TENN. R. APP. P. 36(b).

Mrs. Gibson also argues that the trial court erred in allowing a hearsay letter into evidence. We find that this was also harmless error. Therefore, this issue is without merit. See id.

Now, we turn to Mr. Prokell's issues. Mr. Prokell's first issue relates to visitation. As we stated earlier in this opinion, we remand this issue so that the trial court may consider the evidentiary deposition of Dr. Dixon before it reaches a conclusion.

Next, Mr. Prokell asserts that the amount of child support to be paid by Mr. Prokell should be set in accordance with the Tennessee Child Support Guidelines under a significant variance test. The trial court found that Mr. Prokell's 1999 income was $52,500.00. Therefore, the trial court set Mr. Prokell's child support at $672.50, in accordance with the child support guidelines.

Prior to July 1, 1994, trial courts could modify existing child support awards "only upon a showing of a substantial and material change of circumstances ." TENN. CODE ANN. § 36-5-101(a)(1) (1991) (amended 1994). The General Assembly replaced this standard in 1994 by enacting legislation providing that:

> In cases involving child support, upon application of either party, the court shall decree an increase or decrease of such allowance when there is found to be a significant variance, as defined in the child support guidelines . . . between the guidelines and the amount of support currently ordered unless the variance has resulted from a

previously court-ordered deviation from the guidelines and the circumstances which caused the deviation have not changed.

TENN. CODE ANN. § 36-5-101(a)(1) (Supp. 1995).

In accordance with the amended statute, the Department of Human Services promulgated a rule providing in part that "a significant variance shall be at least 15% if the current support is one hundred dollars ($100.00) or greater per month and at least fifteen dollars ($15.00) if the current support is less than $100.00 per month." TENN. COMP. R. & REGS. TIT. 10, CH. 1240-2-4-.02(3) (1994). A modification must be made if the existing support obligation varies by fifteen percent or more from the amount that the obligation would be based on the obligor parent's current income. See id. In cases where the variance equals or exceeds fifteen percent, the guidelines permit refusing to decrease child support in only two circumstances: (1) when the obligor parent is "willfully or voluntarily unemployed or under-employed" and (2) if the variance results from "a previous decision of a court to deviate from the guidelines and the circumstances which caused the deviation have not changed." See id.

In the instant case, Mr. Prokell was under a June 1996 order setting child support at $1,591.76.00 per month. The trial court found that Mr. Prokell's 1999 income was $52,500.00 and set child support at $672.50 per month. Upon review of the record, we find that the trial court properly reduced Mr. Prokell's child support obligation, as Mr. Prokell proved a significant variance. However, as consistent with our discussion of child support above, the trial court only had the authority to modify Mr. Prokell's child support prospectively from April 15, 1999, which is the date Mr. Prokell's motion for reduction in child support was filed.

**Conclusion**

For the aforementioned reasons, we affirm in part, reverse in part, and remand this case to the court below for further proceedings consistent with this opinion. Costs on appeal are taxed one-half to Mrs. Gibson, and one-half to Mr. Prokell, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, JUDGE