IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
February 27, 2018 Session

## STATE OF TENNESSEE v. FRANK EDWARD SMALL

**Appeal from the Circuit Court for Sullivan County
No. S60656   R. Jerry Beck, Judge**

_____

### No. E2017-01266-CCA-R3-CD

_____

The Defendant, Frank Edward Small, was convicted by a Sullivan County Circuit Court jury of robbery, a Class C felony, and home improvement fraud, a Class D felony. *See* T.C.A. §§ 39-13-401 (2014) (robbery), 39-14-154 (2010) (amended 2012, 2017) (home improvement fraud). He received a Range I, effective five-year sentence to be served in the Department of Correction. On appeal, he contends that (1) the evidence is insufficient to support his convictions and (2) the trial court erred in denying his motion to review the victim's medical records. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

G. Todd East, Kingsport, Tennessee, for the appellant, Frank Edward Small.

Herbert H. Slatery III, Attorney General and Reporter; Katherine G. Redding, Assistant Attorney General; Barry P. Staubus, District Attorney General; Amy L. Hinkle, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Defendant's convictions relate to the circumstances surrounding a transaction in which he partially covered Joseph Beverly's driveway with asphalt. At the trial, the victim, who was eighty-four at the time of the trial and had been seventy-nine at the time of the relevant events, testified that he was at a gas station on January 31, 2011, when the Defendant got into the victim's car and offered to shake the victim's hand as if the victim should have known the Defendant. The victim said he told the Defendant that he did not know the Defendant. The victim said the Defendant began talking about having leftover asphalt that he would sell for $6 per foot, rather than his usual price of $18 per foot. The

victim said that he agreed to buy three feet of asphalt for a total of $18, that he offered a $20 bill to the Defendant, and that the Defendant told the victim to wait to pay him. The victim said that after he pumped his gas, the Defendant followed the victim to a parking lot near the victim's house. The victim said he understood that the Defendant would pave three feet at the end of the victim's driveway to connect the driveway to the road. The victim denied that he and the Defendant walked the driveway together and that he showed the Defendant any cracks in the driveway. The victim said he told the Defendant that the victim's wife was out of town and that the victim was going to Walmart and would be gone for about two hours. The victim said the Defendant was in a gray pickup truck with a dented back fender and that a woman the Defendant identified as his sister was inside.

The victim testified that when he returned from Walmart, he drove into the carport. He said the Defendant drove the Defendant's truck from a nearby parking lot and parked the truck "right behind" the victim's car. The victim said that he did not see a worker picking up tools and that the woman he had seen earlier was not inside the Defendant's truck. The victim said that the Defendant had paved about three-fourths of the victim's concrete driveway with a thin layer of asphalt and that the concrete was visible through the asphalt in places. The victim said he had not agreed to the extent of the paving the Defendant had done. The victim said the Defendant took a piece of paper from the Defendant's truck, that the paper "[h]ad 9,000 on it," and that he and the Defendant had not agreed on a price of $9,000 before the victim went to Walmart. The victim said he would not have agreed for the Defendant to do any paving if the victim had known the price would be so high.

The victim testified that the Defendant asked if the victim had a savings account and that when the victim said he did not, the Defendant asked if the victim had a checking account. The victim said that he took some cold groceries inside while the Defendant waited in the carport and that when the victim returned outside, the Defendant "was right up in [the victim's] face about a foot away[.]" The victim said the Defendant stated, "It's already on the ground. I want my money now." The victim said that the Defendant "was looking real mean" and that the victim was scared of what the Defendant might do. The victim stated that he walked inside to look at his home equity paperwork to determine how much he had available to write a check and that the Defendant followed him into the victim's house. The victim said the Defendant followed him inside without invitation. The victim said that he showed the Defendant that the victim had $6,600 available in the home equity account and that the Defendant said, "Well, 6500 will do." The victim said he wrote a check for $6,500 to the Defendant and that, at the Defendant's instruction, the victim wrote on the memorandum line that the check was for "Construction." The victim said that when he handed the Defendant the check, the

-2-

Defendant "was looking real mean" and that the victim was "afraid of what . . . [the Defendant] might try to do" to the victim. The victim said he felt "under pressure" but acknowledged that the Defendant had not touched him or used "bad language." The victim did not recall giving the Defendant a pamphlet from the victim's church. The victim said that he had worked as a bookkeeper "for a number of years."

The victim testified that after he gave the check to the Defendant, the Defendant wanted the victim to sign a contract. The victim identified his signature on a document, which was received as an exhibit. The victim said he did not see the document until after he returned from Walmart and gave the check to the Defendant. The victim said that after the Defendant left with the check, he took the rest of the groceries inside and called his wife. The victim said the Defendant left around 2:15 or 2:20 p.m. and agreed that he called his wife around 3:50 p.m., but he later said he did not think that much time elapsed between the Defendant's departure and the call. The victim said that his wife was upset and instructed him to stop payment on the check but that the check had already been cashed when he attempted to stop payment. The victim said the Defendant had mentioned returning to finish paving the driveway but never returned.

The victim testified that he had the asphalt removed a week later. He said he had not had any intention of paving the concrete driveway. He said the Defendant had not paved the three-foot area between the concrete driveway and the road, which was the area the victim intended for the Defendant to pave.

When asked if he had suffered a stroke, the victim testified that a blood clot "hit" his brain and that he was given medication which dissolved the clot. The victim agreed that he had been living in an assisted living facility at the time he had a stroke and said he currently lived in a different assisted living facility. When asked if he had residual memory problems from the stroke, the victim responded, "Well, not – not so much about that." He said he had suffered pneumonia "some time back" and had fallen about three years earlier and had two screws put into his hip. He said he had to be careful about what he ate because he only had seven or eight teeth. The victim disagreed that he had memory problems and stated that he had a "pretty good memory" and could recall his birthdate, the month and year he was "born again," the month and year he joined a church, and the names of his pastors.

The victim acknowledged that before the trial, he met with lawyers who showed him "stuff to read" to refresh his memory. He said he remembered what had happened in his interaction with the Defendant relative to paving his driveway. The victim denied that he had asked the Defendant to come to the victim's house "to look at paving over [the victim's] concrete driveway," and the victim denied that he told the Defendant he

was concerned about a crack at the top of the driveway. The victim said that cracks existed in his driveway but that they did not need repairing. When shown photographs of the driveway and asked about a crack, he said it had been a while since he had seen the driveway. He said a photograph of a crack did not resemble his driveway on January 31, 2011. The victim stated he had not wanted the Defendant to cover the driveway with asphalt in order to remedy the cracks. The victim denied telling the Defendant he wanted the driveway "capped" to prevent it from freezing and separating. The victim said that he understood the transaction to involve three feet of asphalt at $6 per foot, for a total of $18, and that he had not given the Defendant "a go-ahead to . . . do what he did."

The Defendant did not offer proof. The jury found the Defendant guilty of robbery and home improvement fraud. The trial court imposed a five-year sentence for robbery and a three-year sentence for home improvement fraud. This appeal followed.

**I**

In five related issues, the Defendant contends that the jury's verdict was contrary to the weight of the evidence, that the verdict was contrary to the law and the evidence, that the evidence preponderates in favor of his innocence and against the guilty verdicts, that the trial court erred in denying the motion for a judgment of acquittal, and that the court erred in denying his motion for a new trial based, in part, upon the sufficiency of the evidence to support the convictions. All of these issues are properly addressed by an analysis of the sufficiency of the evidence to support the convictions. *See State v. Burlison*, 868 S.W.2d 713, 719 (Tenn. Crim. App. 1993) (stating that after a trial court has discharged its obligation as thirteenth juror and approved the verdict, an appellate court must credit the testimony of the State's witnesses and resolve evidentiary conflicts in the State's favor).

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

## A. <u>Robbery</u>

First, we consider the sufficiency of the evidence to support the Defendant's robbery conviction. "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401(a) (2014). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." *Id.* § 39-14-103(a) (2014). The facts of the present case do not include any evidence of an offense committed through violence. Therefore, we will consider whether a robbery occurred by placing the victim in fear.

> "The fear constituting an element of [robbery] is fear of present personal peril from violence offered or impending." *Britt v. State*, 26 Tenn. (7 Hum.) 45 (1846). It must be a fear of "bodily danger or impending peril to the person," *id.*, which intimidates and promotes submission to the theft of the property.

*State v. Bowles*, 52 S.W.3d 69, 80 (Tenn. 2001). "If the circumstances of the theft are attendant to a reasonable apprehension of danger sufficient to 'induce a man to part with his property for the sake of his person,' the crime is robbery." *State v. Edwards*, 868 S.W.2d 682, 700 (Tenn. 1993) (citing *Sloan v. State*, 491 S.W.2d 858, 861 (Tenn. Crim. App. 1972) (quoting 77 C.J.S. Robbery § 16)).

Viewed in the light most favorable to the State, the evidence shows that the victim agreed for the Defendant to pave three feet at the end of the victim's driveway for a total price of $18. The victim offered a $20 bill to the Defendant before any work was performed, but the Defendant told the victim to pay him later. The Defendant followed the elderly victim home and performed a different, much more extensive paving job than the one to which they verbally agreed and which did not include the agreed-upon work. When the victim returned home, he parked in his carport, and the Defendant drove his truck onto the driveway and parked it behind the victim's car. The Defendant initially gave the victim a piece of paper indicating a price of $9,000 for the paving and, when the victim said he did not have that much money, the Defendant asked about the victim's

savings and checking accounts. The Defendant got "right up in [the victim's] face about a foot away[.]" The Defendant said, "It's already on the ground. I want my money now." The Defendant "was looking real mean" at the victim, and the victim was scared of what the Defendant might do. The victim went into his house to retrieve his home equity documents, and the Defendant followed him inside without invitation. The victim said he had $6,600 available in the home equity account, and the Defendant said $6,500 "will do." The victim said he wrote the check, including the word "Construction" on the memorandum line, which the Defendant told him to write. The victim also signed paperwork provided by and as instructed by the Defendant. The victim said he was afraid of the Defendant, who was looking at him in a "mean" way. The victim said he would not have agreed to the paving work if he had known in advance of the high price the Defendant ultimately demanded.

Viewed in this light, the evidence supports a conclusion that the Defendant placed the seventy-nine-year-old victim in fear by parking behind the victim's car, insisting upon being paid a large sum of money for different, more extensive work than that to which the victim consented, looking "real mean" at the victim while demanding payment, entering the victim's home uninvited in furtherance of the effort to obtain money from the victim, instructing the victim to pay the Defendant almost all of the balance in the victim's home equity account, and continuing to look "mean" at the victim and causing the victim to be "afraid of what . . . [the Defendant] might try to do" as the victim wrote the check and signed the contract. A rational jury could find that the victim acquiesced in giving the Defendant $6,500 because the elderly victim, who was home alone, was reasonably placed in fear of impending personal peril by the Defendant's menacing behavior. This behavior included both the Defendant's looking "real mean" at the victim while demanding money and the Defendant's physical acts of parking behind the victim's car and intruding without invitation into the victim's home while making the demands.

In reaching this conclusion, we are guided by our decision in *State v. Darrell Ray Beene*, No. M2013-02098-CCA-R3-CD, 2014 WL 2841072 (Tenn. Crim. App. June 20, 2014), *perm. app. denied* (Tenn. Oct. 22, 2014). In that case, the female victim was alone in a parking lot and was attempting to retrieve her property from her car when two unknown men approached her. The men stood on either side, effectively trapping her. One of the men stated, "I'm going to help you with that," and took several items from her. The defendant, who was the other man, took her purse, which she had been wearing across her shoulder. This court held that the evidence was sufficient to support the Defendant's robbery conviction because "the Defendant's actions would have placed a reasonable person in fear." *Darrell Ray Beene*, 2014 WL 2841072, at *1, 4. Similarly, we have concluded that the Defendant's conduct in the present case, which consisted of physically limiting the victim's opportunity to escape and demanding property by

intimidating the seventy-nine-year-old victim, would place a reasonable person in fear of personal peril if the person did not comply with the demands. The Defendant is not entitled to relief on this basis.

## B. Home Improvement Fraud

The Defendant contends, without argument or other explanation, that the evidence is insufficient to support his conviction of home improvement fraud. Issues which are unsupported by argument are waived. Tenn. Ct. Crim. App. R. 10(b); *see* T.R.A.P. 27(a)(7). Because the issue affects the validity of the conviction, we will, nevertheless, address it briefly.

At the time of the offense in this case, home improvement fraud included the following conduct:

> (2) Deviat[ing] from or disregard[ing] plans or specifications in any material respect that are contained in a contract for home improvement services. Such deviation includes, but is not limited to:

>> (A) The amount billed for the home improvement services is substantially greater than the amount quoted in the contract;

> . . . .

>> (C)(1) The residential homeowner did not provide written consent for the home improvement services provider to deviate from or disregard plans or specifications in the contract; and

>> (2) Such deviation or disregard caused substantial damage to the residential owner's property.

T.C.A. § 39-14-154 (b)(2)(A), (C) (2010) (amended 2012). "Contract for home improvement services" means a contractual agreement, written or oral, between a person performing home improvement services and a residential owner, and includes all labor, services and materials to be furnished and performed under such agreement[.]" *Id.* § 39-14-154(a)(1). The relevant statute also includes driveways within its definition of "home improvement services." *Id.* § 39-14-154(a)(2).

Viewed in the light most favorable to the State, the evidence shows that the victim and the Defendant entered into an oral contract for the Defendant to pave three feet at the

edge of the victim's driveway for $18.  Instead, the Defendant unilaterally and without the victim's consent covered a large area of the victim's concrete driveway with a thin, patchy layer of asphalt that the victim had removed shortly thereafter.  The evidence is sufficient to support the home improvement fraud conviction.  The Defendant is not entitled to relief on this basis.

## C.  Inconsistent Verdicts

The Defendant contends, as part of his challenge to the sufficiency of the evidence, that the verdicts are inconsistent and that he cannot be convicted of both robbery and home improvement fraud related to "theft of the same property."  The Defendant acknowledges that Tennessee law does not compel consistency of verdicts on separate counts of an indictment.  *See, e.g.*, *State v. Davis*, 466 S.W.3d 49, 76 (Tenn. 2015).  Our legislature provided for prosecution of thefts committed by means of home improvement fraud both under the home improvement fraud statute and pursuant to the theft statute.  *See* T.C.A. §§ 39-14-154(b) (setting forth the means by which a person commits the offense of home improvement fraud) (2010) (amended 2012, 2017), 39-14-154(c)(1) (stating that a violation of § 39-14-154(b) is punishable as theft), 39-14-154(e) (stating that prosecution under § 39-14-154(b) shall not bar a prosecution under any other criminal statute).  The Defendant in the present case was prosecuted pursuant to the home improvement statute and the robbery statute.  Robbery is a theft offense involving violence or putting the victim in fear as the means of accomplishing the theft.  *Id.* § 39-13-401.

In considering the Defendant's arguments regarding the sufficiency of the evidence, we acknowledge his argument that the jury's confusion about the issues was evident in its verdict form, which he claims "was originally returned with all charges circled."  To the extent that the Defendant relies on the verdict form, his argument is waived.  The verdict form is not part of the appellate record, and we will not speculate as to its contents.  *See* T.R.A.P. 24, 36(a).

The Defendant is not entitled to relief on this basis.

## II

## Motion to Review Medical Records

The Defendant contends that the trial court abused its discretion in denying his motion to review the victim's medical records.  He argues that he should have been allowed to examine the records in order to determine the extent of any mental deficiency

the victim might have because of its potential relevance to the victim's ability to recall accurately the relevant events. The Defendant argues that evidence of a witness's impaired capacity is admissible pursuant to Tennessee Rule of Evidence 617. The State contends that the Defendant has waived consideration of the issue by failing to include the trial court's order denying the motion in the appellate record.

Although the State is correct that no written order appears in the appellate record, the record reflects that after the State filed its brief, the Defendant sought and obtained permission of this court to supplement the record with the transcript of the hearing on the Defendant's motion to review the victim's medical records. We granted the Defendant's motion, and the transcript of the motion hearing reflects that the trial court denied the motion to review the medical records.[1] The trial court noted its concern about protecting the victim's privacy and stated that the Defendant enjoyed "broad discretion on right of cross-examination and confrontation" of the witness. The court expressed concern that defense counsel was "shooting in the dark" and that collateral evidence of a matter about which a witness could be cross-examined "would probably be totally immaterial."

The record reflects that the defense was permitted to cross-examine the victim about his medical history and his ability to recall the relevant events. The victim acknowledged that he had suffered a blood clot in his brain and a stroke. The defense was permitted to ask the victim about his memory of the relevant events. The Defendant was not prevented from placing before the jury the evidence regarding the victim's memory after having suffered a stroke. The Defendant has not shown that the trial court erred in denying his motion to examine the victim's medical records in order to ascertain whether the victim had any mental deficits as a result of the stroke. *See, e.g.*, *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982) (stating, in a claim of a denial of compulsory process, that a criminal defendant must show that the evidence would have been both material and favorable to his defense); *State v. Michael Anthony Logan*, No. M2013-02701-CCA-R3-CD, 2015 WL 4515141, at *9 (Tenn. Crim. App. July 27, 2015), *perm. app. denied* (Tenn. Nov. 24, 2015); *cf. State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008) (stating that decisions regarding the admission or exclusion of evidence are matters within the trial court's discretion); *Benton v. Snyder*, 825 S.W.2d 409, 416 (Tenn. 1992) (stating, in the context of a civil case, that decisions regarding pretrial discovery issues are to be addressed within the sound discretion of the trial court). He is not entitled to relief on this basis.

---

[1] The medical records were not in the State's possession, and as such, no discovery issue existed. The Defendant sought a court order to compel the medical providers to allow him to examine the victim's medical records.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE